GRELL et al. v. UNITED STATES.

DE MONTREVILLE v. SAME.

Nos. 11400, 11416.

Circuit Court of Appeals, Eighth Circuit.

June 17, 1940.

Rehearing Denied July 22, 1940.

Claudio Delitala and S. D. Flanagan, both of St. Louis, Mo., for appellants.

David M. Robinson, Asst. U. S. Atty., of St. Louis, Mo., and Harry C. Blanton, U. S. Atty., of Sikeston, Mo. (Russell Vandivort, Asst. U. S. Atty., of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

The appellants, Clarence DeMontreville, F. M. Grell, A. E. Grell, T. Kaemmerer, John B. McKinley, W. N. Hickey and L. G. Huge, with forty-two others, were convicted under an indictment which contained ten counts charging the use of the mails for the purpose of executing a scheme to defraud and for obtaining money by false representations and promises, in violation of Section 215 of the Criminal Code, 18 U.S.C.A. § 338. DeMontreville, F. M. Grell and A. E. Grell were found guilty upon all counts and the other appellants were convicted upon the first count only. DeMontreville has appealed separately, the others jointly, and both appeals are presented on the same record.

It appears that in July, 1935, DeMontreville and his wife and the two Misses Grell, sisters-in-law of DeMontreville, organized a Missouri corporation called Public Service Institute, and thereafter carried on a correspondence school in the name of the corporation from offices located on the second floor of the building at 425 De-Baliviere Avenue in St. Louis. DeMontreville was president of the corporation and had general direction and control; Frances M. Grell was the vice president, and Angeline E. Grell was secretary-treasurer. They had some experience as teachers and in the correspondence school business, and had a prepared course of instruction in elementary subjects arranged into a correspondence course in fifty lessons which were mailed to pupils one at a time in a certain order. The pupils would work out and answer the problems and questions and return them to the Institute for correction and would receive them back with the correct answers noted thereon. Such corrections would be made by means of a key furnished to several young women who worked in the office in charge of Angeline E. Grell. There is no substantial claim that the course of instruction was not a sound course of its kind, nor that it was without value.

The Institute advertised for subscribers to the course and employed salesmen to the number of about two hundred from first to last to canvass in various parts of the country inducing enrollment contracts by personal contacts and solicitations. The salesmen worked on a commission basis of thirty per cent of the subscription price of the course, retaining the down payments to the amount of their percentage. Through its advertisements and the activities of the salesmen, the Institute induced the enrollment of some 7,069 pupils during the period from July, 1935, to May, 1937, when enrollments were discontinued following the issuance of a fraud order by the postal department. Each of those enrolled agreed to take the course and to pay eighty dollars on the installment plan, or, in some instances, sixty-five dollars in advance. A large amount of money was thus obtained from them and this prosecution was based on charges that the means devised and used to induce enrollments and to obtain money from persons enrolled, and attempted to be enrolled, constituted a fraudulent scheme, and the mails were used in furtherance thereof.

## The Indictment.

The indictment named as defendants the officers of the corporation and the other appellants who were employed by the corporation as salesmen, and other salesmen and employees who are not parties to the appeal, and charged that defendants and others had devised a scheme to defraud and obtain money by false representations and promises from certain named persons and others, members of a class referred to as victims, whom the defendants would induce and attempt to induce to send their money to defendants in payment of correspondence courses, training, qualifying and fitting said persons to pass Civil Service examinations as given by the United States government, and to educate, qualify and secure for said persons divers positions of employment with the United States government. The alleged scheme is then described with particularity in several pages of printed matter, and presents in the form of an integral and unitary scheme the several fraudulent means alleged to have been devised and followed out by defendants for obtaining from many thousands of persons contracts and payments of money for the Public Service Institute's correspondence course. It is charged as a part of the scheme that the victims were falsely told and led to believe that the Institute was engaged in selecting men and women for employment in positions with the United States government, and in selecting men and women for training for positions for which they had necessary preliminary qualifications, and were falsely told and led to believe that the correspondence courses were of such a nature and quality as would equip those who completed

the same for employment under applicable Civil Service regulations, and were falsely told and led to believe that by subscribing to one of the correspondence courses the subscriber would be assured and guaranteed the securing of such employment under the government. It is charged that the defendants had prepared and used a form of contract called "Enrollment Agreement", which all victims were required to sign, and the amount and terms of payment for the course, together with a so-called Refund Agreement, were embodied therein. It is charged that in truth and fact the defendants well knew the Institute was engaged solely in the business of selling and furnishing its correspondence courses of fifty lessons to the general public, and to any one who could be induced to subscribe for the same, regardless of the preliminary education, qualifications or physical or mental fitness of the victims to meet the Civil Service examinations for selection and appointment to a position with the government. As part of the scheme, and to carry out the objects thereof, it was charged that defendants would make and cause to be made, specific false representations, separately numbered and set out. Such representations included the assuring of a government position to the victims; that Civil Service examinations would be held shortly after the completion of the courses; that government positions would then be open to the victims; that all persons whose contracts were accepted by the Institute were eligible for the position for which the course of instruction was purchased; that "text material" was ordered immediately upon acceptance of the Enrollment Agreement from each student; that the name of each student was indented upon the text material immediately upon the enrollment of the student; that many students trained by the Institute had obtained Civil Service positions as the result of such training; that the Institute and persons connected with it were directly connected with the federal government; that the Institute maintained a resident school at St. Louis where hundreds of students attended daily; that persons on the Institute's teaching staff also held Civil Service positions with the government; that through connections the Institute had with the government it would be possible to place students in Civil Service positions.

A further part of the scheme charged was that the salesmen soliciting victims would, in order to convince the victims that government positions were open and available, lay great stress upon the condition of the contract for refund of all moneys paid for the course in the event the victim failed to secure a government position. A copy of the Refund Agreement was incorporated and it was charged that the condition stipulated for obtaining any refund by the victim was so set up that there was little, if any, possibility of the victim ever obtaining any refund of any amount paid.[1]

A further part of the scheme charged was that after a victim had enrolled and become dissatisfied or wanted to discontinue his installment payments, it would be falsely represented to him that the Institute had expended more than $19.75 (the usually required down payment) in preparing his text material, assembling lessons and in-

---

[1]

"An Educational Institution | (Picture of Eagle) | Incorporated Under State Laws of Missouri.

Public Service Institute, Inc.

Refund Agreement.

"It Is Understood that the Public Service Institute, Inc. agrees to refund all money paid by ............... if I have met the following conditions:

"(a) I am to complete each lesson of the entire training promptly, as received, sending in all work and examination papers for correction.

"(b) I am to make all payments direct to the Public Service Institute, Inc., (except down payment attached hereto) to be received on or before date due.

"(c) I am to try the first examination or examinations which I am qualified to take as specified by the Government at the time such examinations are announced by the Civil Service Commission.

"(d) If I fail to pass such government examination, I am upon written application to receive a refund of the entire amount paid by me for this training, or I will be trained without additional cost for future governmental examinations, which the Government qualifications will permit me to take, until I pass an examination with a grade high enough to make me eligible for an appointment in governmental service.

.................... ....................
Secretary-Treasurer    President
(Seal)"

denting the student's name and number thereon, so that it would be of no use for any other student, and that in order to be released the victim would be required to pay said additional $19.75, all of which was untrue.

A further part of the scheme charged was to induce the victim to accelerate payment of his deferred installments by promising to send him a dictionary valued at $5. The promise was false and the dictionary which would be sent would cost only 79 cents and would not be of the value represented.

A further part of the scheme charged was that the Institute would accept enrollments of victims for any and all Civil Service positions and upon payment therefor would proceed to send a course of form lessons or instructions, the entire number of which consisted of fifty lessons, and that the same lessons would be sent to each victim without any regard to the particular government position for the training for which the victim had enrolled, and that those so-called instructions or lessons were elementary in character and dealt with elementary subjects such as are taught in the grade schools of the common public school system; that said courses of instructions would not and could not train, educate or qualify the victim to pass the Civil Service examinations for which the victim had enrolled to be trained.

The indictment also charged that the defendants intended by their scheme to induce said victims to part with their money for said correspondence courses which said money the defendants would appropriate for their own use without enabling the victims to secure any government position which the victims would be and were induced to believe they would receive by and through subscribing and contracting for said service and training offered them by said Institute. In each count the sending through the mails of a letter, which is set out in full, was charged to have been done by the defendants for the purpose of executing the scheme.

*Motions before trial.* Both in the trial court and in this court different counsel have represented the persons who were officers of the corporation and those who were employed as salesmen and the bearing of the charges and of the evidence upon the respective individuals was kept clearly in view. Several motions for severance were made and there were separate motions for bills of particulars, separate demurrers to the indictment and motions to strike out parts of the indictment. All preliminary motions were overruled and no attack has been made upon such rulings in the points for argument in this court except in respect to the refusal of the court to require a bill of particulars. Upon careful examination of the indictment, we think that it clearly informed the defendants of the nature and cause of the accusation against them and was in all respects sufficiently certain and definite and properly charged the offenses therein described. We find no abuse of discretion in the court's refusal to require a bill of particulars.

*Motions for directed verdict.* Motions for directed verdict on the ground that the evidence was insufficient to sustain conviction were made at the close of all the evidence on behalf of the several defendants and error has been assigned and argued in respect to the denial of the motions. We have accordingly been required to examine the record to determine the sufficiency of the evidence to sustain the verdict and judgments.

The business carried on in the name of Public Service Institute included a great amount of detail. It was on a large scale and occupied and affected many people. In order to picture its operation adequately to the court and jury, many witnesses were examined and a large number of exhibits were introduced. In consequence, the record of the evidence is very voluminous. No useful purpose could be served by undertaking to epitomize it. Our examination of it convinces that the business of the Public Service Institute, as it was planned and as it was carried on, was in fact a scheme to defraud and to obtain money by false representations and promises in the manner and form as charged in the indictment.

It is made fully apparent by the evidence that the correspondence course of fifty lessons was not offered for sale or sold upon any true explanation or representation of what the course in fact was, namely, a single course for all subscribers alike, comprising fifty lessons, elementary in character and dealing with elementary subjects such as are taught in the grade schools of the common public school system. On the contrary, there is convincing evidence

that from the inception of the business there was a consistent and common purpose and effort of many persons co-operating together to trade upon a widely prevalent desire, which existed or was easily stimulated, on the part of many men and women to obtain positions under the government; and taking advantage of that desire, the actual business of the Institute throughout the period of its operations was to obtain money from subscribers to its correspondence course by false representations and promises, leading those who contracted for and took the course to believe that they would thereby be assured of getting government positions under Civil Service examinations. Some eighty-nine witnesses for the government who had been induced to enroll in the Institute were examined and cross-examined at length, and it was shown beyond all doubt that they had been grossly deceived as to the true nature of the correspondence course of instruction which the Institute was offering, and that the false representations and promises described in the indictment had in fact been made to them to induce the belief on their part that they had been selected for training for the various government positions and that by contracting and paying for and taking the Institute's courses they would be assured of obtaining the positions; that the courses were sufficient for that purpose, and that the Public Service Institute by reason of its special information, experience and connections with the government, could and did assure them all such positions and would guarantee to return their money otherwise. It appeared that each of the specific representations set out in the indictment was made to the various prospective students at various times and places throughout the country, and the evidence is clear that there was a substantial uniformity in the general approach to the persons solicited and in the representations used to induce them to believe in the assurance given them of securing government positions through the Institute and its courses on payment of the money required. There was convincing competent evidence that there were in fact no reasonable grounds for any honest belief in the representations made or any good faith, hope or expectation of fulfilling the promises.

The Chief of the Examining Division of the United States Civil Service Commission testified in detail to the methods and procedure of the Commission in examining applicants for government positions and the procedure followed in selecting the personnel of the various departments of the government under the Civil Service laws and regulations, and it is apparent on the evidence that the education which could be attained by completion of the Institute's course of fifty lessons would be entirely insufficient to meet the requirements for the great majority of the positions and could at best be of incidental advantage only in respect to a small proportion of them, and then only when present in combination with other requirements of experience, training and special qualifications. The course was not adapted or adequate to train a pupil for any particular position with the government under Civil Service, and as to such positions in general it could be of use only to the limited extent indicated. Though more than seven thousand persons were enrolled by the Institute and it carried on for nearly two years, there was no evidence that any person had ever obtained any government position as a result of its course of instruction. Nor was there any evidence that any person connected with the Institute had ever successfully trained or educated any person for Civil Service examination. One of them, F. M. Grell, had taken a Civil Service examination and had failed to pass.

As nearly all of the enrollment contracts called for payment on the installment plan, it inevitably would and did happen in the course of the enterprise that many persons wanted to discontinue the course and their payments thereon. His or her attention would then be called to a clause in the enrollment contract to the effect that the obligation thereof was irrevocable; and in order to induce a payment of $19.75 the representation would be made concerning the Institute's having expended more than that amount in preparing text material, assembling lessons and indenting the student's name and number thereon so that it would be of no use for any other student, and that in order to be released the student would be required to pay said additional $19.75. The making of such representation to induce payment of money to the Institute was a practice consistently followed by the Institute under the circumstances stated in the carrying on of the business. The salesmen were entitled, un-

der the plan of the enterprise, to take the down payments made to them to their own use, and the importance to the Institute of means to obtain some money from such students for itself is apparent. A collection department was maintained by the Institute called United States Collection and Credit Agency, which was administered by a defendant who signed different names to the communications used to bring pressure in making collections from all who were tardy or delinquent in payments. The evidence clearly shows that these representations were false. There was a single course of instruction for all, and the lessons were printed in large lots as needed and were marked for the student at the time when they were mailed to him or her.

There was also a consistent practice in the business to induce acceleration of deferred installment payments by promising to send a dictionary valued at $5, and the dictionary sent to those who availed themselves of the promise would cost only 79 cents and would not be of the value represented.

The letters set forth in the indictment were mailed as charged.

The claimed insufficiency of the evidence to show the existence of the scheme described in the indictment is without merit. Such a scheme was clearly proved to have been in operation; many persons were being deceived and many thousands of dollars were being fraudulently obtained from them through its operation.

*The individual defendants.* The business was carried on by the co-operation of two groups of persons, those who worked in the office and those whose work was out in the field, and it is contended for each member of each group that all the evidence is compatible with the hypothesis that he or she was acting without knowledge of the fraudulent character of the scheme through which the money was obtained or attempted to be obtained in the business. Guilt is personal, and without such guilty knowledge brought home to any defendant he or she would be entitled to acquittal. Our task is to consider the evidence in relation to each appellant.

*The officers.* We inquire first as to DeMontreville and F. M. Grell and A. E. Grell. They, together with DeMontreville's wife, who was not indicted, were the ones who had the correspondence course comprising fifty lessons and who organized the corporation, and they carried on the business from day to day at its offices in St. Louis. That they received a large part of the money obtained from the victims who had been fraudulently induced to part with it is manifest. But there were very few instances in which any of these appellants had personally solicited persons to sign the enrollment contracts and there was no direct evidence of any conversations in which any of them instructed the salesmen to make any of the false representations or promises which were in fact made, as set out in the indictment. The salesmen under their commission arrangement with the Institute had an interest of their own in inducing enrollments and in getting money from the prospects, and the sufficiency of evidence as to them is later considered. The evidence of the guilt of the officers of the corporation must be found, if at all, in the other transactions in the enterprise attributable to them personally.

The initial step in the approach to the public to induce enrollments for the Institute's correspondence course was the publication and distribution of advertisements assuming to give information and to solicit inquiries concerning the business. These appellants were clearly shown to have had knowledge of such advertisements and we have read them in the light of the evidence concerning the real character of. the correspondence course of fifty lessons offered by the Institute. The advertisements are too lengthy to set out, but a conspicuous feature is that the persons conducting the Institute are held out to be "Civil Service Experts", and they are represented to be persons who know how to obtain Civil Service positions under the government and are able and ready to inform inquirers how to secure them. The following excerpts from the advertisements are illuminative:

## "Flash!

"There Never Was A Greater Opportunity To Get Into Governmental Service Than There Is Today!"

"You Have A Right To A United States Governmental Position, Or At Least An Equal Chance For One, Under Civil Service Regulations,....if.................

"1. You are not a criminal, with a conviction standing against you!

"2. If you are over 18 years of age, and in reasonably good health without handicapping disability, physically.

"3. If you Are Not Too Lazy to go after a Governmental position!

"Uncle Sam Is The Largest Employer In The World!"

"Salaries range from $1080 a year to $3000 a year. You receive a pay-check twice a month, every month in the year—you have greater security than in outside employment; receive two weeks' vacation with pay each year; and when you become too old to work, receive a pension for life for past services! That is why Uncle Sam Is The Best Employer In The World!"

"Any one interested in a Governmental position has the Right to know all about how to get one—what is necessary—and Without Cost!

"The Public Service Institute is in a position to give you full information on requirements which will be sent without obligation or cost. Don't lose an opportunity because you didn't know how to go about it! As An American Citizen This Is Your Right!

"The enclosed card requires no postage. Drop it in any mail box.

"Public Service Institute.

"Publicity Department."

"Fortify Yourself Against Uncertainties

"Secure A Government Position at First Opportunity.

"Thousands Appointed During Past Year.

"We are offering to help you for a very small fee, and ask you to think this over seriously, and act NOW.

"Public Service Institute

"Civil Service Experts."

The reply cards referred to in the advertisement were addressed to the Public Service Institute and contained the following: "Please send me information as to what kind of a Civil Service position I am qualified for and how to secure one of Uncle Sam's many jobs in the shortest possible time. This does not obligate me in any way."

These advertisements drew many replies on the prepared forms requesting the Institute to "send me information as to what kind of a Civil Service position I am qualified for and how to secure one of Uncle Sam's many jobs in the shortest possible time".

The advertisement and the form of the reply to the advertisement were adapted and obviously intended to instill the belief that those conducting the Institute were Civil Service experts who knew and were ready to advise how the persons who were being solicited could "secure one of Uncle Sam's many jobs". When the request or "lead" was received at the office of the Institute, a salesman would forthwith be sent to the "prospect" to attempt to induce him to enter into an enrollment contract and make the required payment. The credentials furnished the salesman were adapted to conceal the true nature of the correspondence course of fifty lessons which he had to sell and to conceal the fact that he was simply an agent of a private company seeking to make a sale on commission. He was given the subtly devised designation of "Public Service Institute Field Advisor" printed on a card used in making his approach, and in the role of such "advisor" in the "Public Service Institute" he was expected to and did advise the "prospect" in the selection of "one of Uncle Sam's many jobs". As he came accredited by an Institute with a name suggesting relation to the public service, conducted by "civil service experts" holding out that they knew how to secure government positions, the pseudo-advisor was manifestly placed in a more favorable position to make the sale on which his commission depended than was warranted by the true facts.

Each salesman was also provided with a manual of information and instructions comprising some thirty-eight pages containing, among other things, a statement that the Public Service Institute had "complete training covering Civil Service examinations in the following branches of government service" (naming some thirty-three positions) and the form of Enrollment Agreement was furnished him. It contained a blank intended to be filled out with the description of particular government positions desired by the prospect. The salesman assumed to give advice to the "prospect" in the selection of positions desired and inserted the position selected in the blank space left in the contract for that purpose. The contract then read, "The Public Service, Inc. agrees to furnish the training and instruction service for the Civil Service Examination for the above positions."

It appeared that a most important means to induce contracts was the so-called "Money Back Guarantee issued by the Institute". On each Enrollment Agreement the words "Refund Agreement" appeared conspicuously in large type and under it the condi-

tions of refund were set forth in smaller type. Such conditions were worded as set forth in the indictment, and that they were so set up that there was little possibility of holding the Institute thereon is apparent. But the Refund Agreement lent an appearance of readiness to pay the money back if the government position was not secured and it was well adapted in connection with the other inducements to aid the "advisor" to overcome all doubts. It was adapted to enable him to make the assurance of securing the government position seem certain to the prospect and helped the agent to make the sale of the correspondence course and obtain a payment on the contract. Such contracts were returned to the Institute office and constituted the basis for the subsequent correspondence and dealing between the Institute and the person enrolled. The testimony was that about one prospect out of eight finally signed the enrollment contract and as some seven thousand actually signed up, it would appear that more than fifty thousand persons were approached and solicited by the so-called Field Advisors during the period while the scheme was in active operation.

The natural consequence of the acts of these defendants would be to cause the prospects in such transactions to be deceived. They tended to give the salesmen the appearance of being empowered to select persons for training for government positions and to select the positions and to assure that the positions would be obtained and to give a "money back guarantee", and there was substantial evidence that such appearance of authority was not warranted by the facts known to these appellants. Deception and defrauding of many persons did result in the carrying on of the scheme, and we find nothing throughout the voluminous record to rebut the fair inference that such was the intent of the officers of the corporation.

The manuals of information and instruction to the salesmen contain extensive printed matter concerning the Civil Service laws and regulations and the number and variety of government positions under the Civil Service. Such printed matter is adapted to create enthusiastic desire for such positions. But it does not contain any true explanation or description of the single correspondence course which the Institute was selling to all who could be induced to buy it, and it falsely represents that the Institute had complete training covering Civil Service examinations in thirty-three specified positions in the several branches of the government.

It contains a paragraph under large type heading "Our Money Back Agreement", in which it is stated, "We issue a 'money back guarantee' ", and "If the candidate should happen to fail on any examination which we have advised him to take * * * the investment we have in that candidate is a total loss to us". The statements were not justified by the wording of the "Refund Agreement" actually issued to the students and were deceptive. The numerous bulletins issued to salesmen were mainly devoted to stimulating more strenuous sales activities and they contain nothing of substantial aid to these defendants.

Throughout the life of the enterprise the Institute was held out to be connected with the government and to be engaged in selecting persons for training for the government service. The officers testified positively that they did not authorize such representations and they point to provisions printed in the salesmen's manuals and in some of the enrollment contracts and in letters and bulletins where it is stated that the Institute is not connected with the government. Only one of the salesmen was called as a witness for the government. He stated that Mr. DeMontreville urged him to always refer to the fact that he had gone to college three years and that it would not hurt to say that he had taken Civil Service examinations. "He (Mr. DeMontreville) stated that if a person asks you whether or not this Institute is connected with the government, you don't have to answer that particular question. Evade that question". Although it may well be deduced from the whole evidence that the officers of the corporation knew the seriousness of the offense of openly impersonating government officers or directly representing the Institute to be a government agency and made written records to absolve themselves from such offenses, the evidence leaves no reasonable doubt of their deliberate intention to deceitfully identify the Institute's activities with those of the government and to trade upon the general confidence of the public in the government.

The important element of the scheme by which $19.75 was obtained and attempted to be obtained from the dissatisfied or unwill-

ing subscribers by means of false representations is not shown to have been directly participated in by the salesmen. It was carried on by correspondence through the mails from the office in St. Louis and there was sufficient evidence of the active participation and knowledge of these defendants. There was also sufficient proof of the false promise to send a dictionary valued at $5.00 in order to induce the payment in advance of deferred installments payable under the enrollment contracts.

Full consideration has been given to the testimony given by these defendants in their own behalf, but we find no error in the trial court's refusal to direct a verdict of acquittal for any of them.

■ *Salesmen.* The appellants who were salesmen for the Institute attack the adverse ruling on their respective motions for directed verdict from a different angle. There is no direct evidence that any of them participated in preparing the correspondence course or the advertisements or contract forms or salesmen's manuals or bulletins, and no written correspondence from any of the salesmen who have appealed appears in the record. None of them is shown to have participated in those parts of the scheme whereby the subscribers to the course were fraudulently induced to pay $19.75 after they had indicated that they wanted to discontinue the course, nor in the false promise concerning the dictionary valued at $5. Each of them sold the correspondence course and obtained money therefor from persons who testified that they had been deceived, but each of these appellants affirmed his belief in and reliance upon the information given by the officers of the Institute and each takes the position that he was not shown to have taken any part with knowledge of the existence of any fraudulent scheme or with intent to further any such scheme if it existed.

As to appellant L. G. Huge. It appears that Mr. Huge worked for the Public Service Institute something less than five months between November, 1936, and April, 1937, and made many solicitations and sales. Four witnesses testified for the government that he was the salesman who had personally solicited and induced them to enter into their respective enrollment contracts with the Institute. Their testimony was given many months after the conversations to which it related had taken place and though the conversations were shown to have been lengthy, the narratives of their testimony in the record are brief. But the fair inference to be drawn is that each of the four persons who testified was deceived in regard to what he would get for his money and was induced to sign the contract and make payment by false representations. The deceit was substantially the same as that which characterized the scheme shown to have been in operation. The accounts of the solicitations made to these witnesses differ from each other in details but the witnesses were all led to believe that they had been selected for training for the particular government positions written into the contract on the advice of this appellant and that the Institute could and did assure them that the positions would be obtained on completion of the course and taking examinations, or their money would be refunded. One witness who dealt with Mr. Huge was told by him that the instructors in the Institute were in the Civil Service employ and knew the nature of the Civil Service examinations. Mr. Huge told her that there were quite a few people that had gotten jobs and he could take her to different people who had taken the course and gotten jobs, all kinds of jobs, with the government. Another stated, "I had a conversation with him (Mr. Huge) as to this here examination. I was supposed to take this training, which would take me about six months if I spent from half an hour to an hour a day on it, and then I would receive a notice as soon as there would be a Civil Service examination and from that examination I would receive a job, or after I had taken two examinations, I think it was. I would receive a job or my money would be refunded". "He said it (the course of instruction) would be made up to fit the person that the instructions would be given to". "I signed an enrollment agreement designating Postal Clerk on it". Another of these witnesses said, "I first knew this school was not connected with the government after I signed the contract". The other testified that this appellant told him that St. Louis was divided into a number of districts "that they (persons who were training students to pass Civil Service examinations) were only selecting four from my district, and I was one of the chosen students". "He said the teaching staff had been Civil Service employees".

Mr. Huge testified in his own behalf that he had believed and relied upon statements made to him by DeMontreville and the information in the manual furnished him. He denied that he had made the misrepresentations attributed to him or that he had deceived or misled any of the persons whom he solicited. He knew that neither the Institute nor its personnel was in any way connected with the government and that no person could be assured a position with the government or success in passing Civil Service examination and stated that he made no representations to the contrary. He honestly believed the correspondence would be helpful to those ends and so stated to all his prospects. On consideration of all of the evidence showing the operation of the scheme to obtain the money of the subscribers to the correspondence course we hold that the question of this appellant's guilt was for the jury.

As to appellant Kaemmerer. Five witnesses identified this appellant as the salesman who had personally solicited and secured their enrollment contracts and payments thereon. Their testimony, abbreviated in the record, includes the following matter prejudicial to Mr. Kaemmerer: Mr. Kaemmerer said "that he had a school that would get them a government job". "The course would take four to five months". "I told him I didn't think I had enough education for the schooling and he told me he knew a boy in St. Charles County who couldn't even read or write who passed the examination and was working for the government today". He said, "I work for the government and have been for a number of years".

"He informed me that I was one of the chosen few that the Civil Service Commission had picked out in that territory for examination as a prospect for a government position". "Mr. Kaemmerer stated on his second visit that he had recently met a girl in Maplewood, or some surrounding territory in St. Louis County who through him had obtained a Civil Service position". "He said this girl had been trained through his Public Service Institute".

"In 1936 I was helping my dad on a farm". "He (Mr. Kaemmerer) came there one morning and told me that I ought to take that course; that I could get a job". "He told me it was a course that would give me a Civil Service job after I had it completed". "He said he was getting boys around there from that locality, and he

needed a few more to fill out his class". "He suggested the position of lay inspector. He said that at the start the salary would be sixteen hundred dollars a year. He said it would be like a meat inspector, or something like that". "He said the school had been in operation for ten or twelve years, I believe, something like that". "He said that some of the officers were ex-government employees." "He said that part of them were government and the rest were college graduates". "At the time I signed the enrollment agreement Mr. Kaemmerer told me that this course would prepare me for the Civil Service examination for the position of lay inspector. He said that was a meat inspector". "He asked me if I was interested in a Civil Service position. I told him 'Yes'. He said if I would take a course, and after I had completed it, I would get notice of an examination, and this course would enable me to pass this Civil Service examination. He especially mentioned the fact that a friend—he had gotten a job for him. I know the man and he has a Civil Service position, and he said it was through him he had gotten the job". "Mr. Kaemmerer called on me and asked whether I was interested in a government job. I said I was, and he explained various jobs to me, and I said I never had very much education. He said 'Well, we have easy jobs that wouldn't need so much of an education'. I didn't want to sign no contract— I signed a contract". The mother of one of the witnesses present at the solicitation of her son by Mr. Kaemmerer testified: "Mr. Kaemmerer said at the time he was a government man representing the Public Service Institute for training young girls and boys for government positions". "Mr. Kaemmerer thought that by the looks of his (the son's) size, he would make a good mail carrier or field inspector, because he was a farmer and was used to being outside most of the time". "Talking about this refund agreement—I said, 'Would the government do such a thing?' He said, 'The government would not keep any of your money. They would refund every penny'".

It is apparent from the cross-examination of these witnesses that their conversations with Mr. Kaemmerer were extensive and that no more than a few salient matters were retained in memory. They were vague and self-contradictory as to some matters. Mr. Kaemmerer's own tes-

timony was specific and his denials were positive. He worked for the Institute some four and a half months and insisted that he had made no representations except such as he believed and had reason to believe were true.

But the testimony of the six witnesses who testified concerning this appellant's solicitations constituted substantial evidence that misrepresentations and promises were made by him of the same character as those then being generally made in the prosecution of the scheme. The issue as to his guilt was for the jury and we find no error in the refusal to direct acquittal.

As to appellant W. N. Hickey, who was in the employ of the Institute from November, 1935, to April, 1937, and sold the course to many persons. Five of them testified as to their transactions with him. We excerpt the following from their testimony: "He asked me if I would be interested in a government job and I told him I would". "He explained to me the advantages of a government job and also the salary and the retirement. He told me that this Public Service Institute, or that the faculty, or the teachers, sometime or other had been in the Civil Service, and that they would give me all the instructions necessary to get this job. He said that I had been selected from that district—the only one to be selected—that one of my teachers had given him my name". He "told me that the employees at some time or another had been Civil Service people". "I signed a contract on that occasion asking for the position of Field Service, in reference to soil conservation". "At first I wanted a job in Forestry and Mr. Hickey didn't seem to think that would be the proper job for me and advised this Field Service. He said Field Service would apply to soil conservation and controlling of erosion and building up of the land". "He wanted to know if I was interested in a government job". "He said he got my name from the high school. I was recommended among two or three. I was one of the lucky ones." "He suggested that I try for the position of soil conservation, pertaining to the erosion of soil, to keep the soil from washing away". "Mr. Hickey said the course would last around six months, and I was to complete the course and then there would be a Civil Service examination held in Indianapolis some time in April, and I was to compete in that examination, and

if I didn't make a passing grade in that I would be given additional examinations at a later date; and if I didn't make a passing grade in that I would be given additional examinations at a later date, and if I failed to pass this examination my money would be refunded". "He explained it to me as a course so you would be entitled to a government job". "He said I was one of the few selected out of the community for taking a Civil Service course from the Public Service and he asked what education I had, and I said I was a graduate of a college, and he named custom inspector and immigration inspector for the position I was to work for". "He wrote in the words Custom Inspector and Immigration Inspector (into the contract)". "I took two Civil Service examinations in California; that was before I signed up with the Public Service Institute. I told Mr. Hickey about having taken those examinations. I was desirous to get back to California. He thought I would be able to get back in California by taking that course". "I do not know of my own knowledge whether there is a Civil Service examination for Custom Inspector, or Immigration Inspector—only Mr. Hickey said there was". "About the first thing he asked me was if I would like to work for the government. Naturally I said I would. He asked my name, and I told him. He said I was the one he was hunting. He said he was picking out two out of townships in that community to take this course, and he knew very much about me, he knew practically my grades in school." "He told me he was representing a government school. He brought the contract out and I noticed it said the school was in no way connected with the government. I questioned Mr. Hickey on this. He said it wasn't exactly a government school but the government did back its activities". "Mr. Hickey stated that the government backed the school." "He said that quite a few of the former students that took the course had obtained Civil Service positions". "He said he was selecting ten people in my community and that [I was] the tenth one at that time, and that if I would not enroll he would take someone else. He said he would guarantee me a position with the government if I would pass a grade of ninety, and that if I did not pass the grade of ninety, they would refund the money". "He said at that time there was going to be a new route opened in our vicinity, a new mail route

near Cedar Rapids." "I thought that would be a pretty good chance for me to get a job. And he also stated that the school would instruct me just when the examinations were to be held." "Mr. Hickey said that the school had information from the government just when these Civil Service examinations were to be held". "The words 'Rural Motor Carrier' 'City Carrier' and 'Post Office Clerk' were written therein (in the contract) by Mr. Hickey."

Notwithstanding the cross-examination of these witnesses and the testimony given by Mr. Hickey in his own behalf, we think the question of his guilt was for the jury.

As to appellant John B. McKinley. Three witnesses testified that their contracts had been solicited by this appellant and the following excerpts are taken from their testimony: "I was working for the Western Union as a messenger * * *. He asked me if I was interested in a government job and I told him I was. * * * He said that government jobs were short hours and good pay. * * * He said that people who had taken the course and passed Civil Service examinations had gotten jobs with the government, and offered to furnish the names of some people. He said the persons at the school were working for the government; that they all held government positions and they are supervised by the government. I didn't read any part of the contract". "He said that the staff (of the Institute) was well trained on the subject of Civil Service training". "Mr. McKinley told me that the Public Service Institute would train me for one of the positions set out (in the enrollment contract)". "He said that the staff of the school were connected with the government and they could easily prepare me for the examination, since they knew the questions that would be asked in the examination".

We cannot conclude that the trial court erred in refusing to direct acquittal of Mr. McKinley.

■ *Claimed errors on the trial.* (1) Testimony admitted. (a) Many of the assignments of the appellants relate to the admission in evidence over objections of conversations had and statements made by the various agents of the Institute in the course of their work of soliciting and selling the correspondence course to members of the public. The several defendants who were not present at such transactions ob-jected that such conversations and statements were not binding upon them and these appellants contend that the adverse rulings on such objections were erroneous as to them. But we think that there was substantial evidence to show that the scheme to obtain money by the false representations and promises charged in the indictment did in fact exist. Those who were in charge of the office of the Institute and those who worked in the field were shown to be co-operating together to obtain money from the victims of the scheme and the representations and promises that were being made at widely different places to different persons, by numerous agents throughout the period presented similarities sufficient to identify them with the common scheme. It is shown that the common purpose and effort was to sell the correspondence course and to obtain money by representations and promises concerning the assurance of government positions to the victims, the ability of the Institute to enable them to secure such positions and the money back guarantee that was held out. We find no error of the trial court in overruling the objections to the testimony concerning the conversations and transactions of the Institute's salesmen. United States v. Littlejohn, 7 Cir., 96 F.2d 368; Lonergan v. United States, 9 Cir., 95 F.2d 642; Ader v. United States, 7 Cir., 284 F. 13; Whitehead v. United States, 5 Cir., 245 F. 385; Ridenour v. United States, 3 Cir., 14 F.2d 888; Pandalfo v. United States, 7 Cir., 286 F. 8; Lathrop v. United States, 9 Cir., 2 F.2d 497; Robinson v. United States, 9 Cir., 33 F.2d 238; Chambers v. United States, 8 Cir., 237 F. 513; Barrett v. United States, 8 Cir., 33 F.2d 115, and Osborne v. United States, 9 Cir., 17 F.2d 246.

■ (b) Complaint is made of the admission of the testimony of the witness Schlingman concerning his conversation with one Joseph Flaum. The testimony tended to show improper conduct on the part of one Al Flaum, a defendant, to prevent disclosure of testimony against him. But the testimony did not purport to reflect upon any of these appellants and could not have affected the jury in its consideration of their guilt or innocence. No request was made to have the court point out this obvious fact to the jury and the rulings on the testimony present no ground for reversal.

■ (c) A letter was written to the Institute by a lawyer at Humphrey, Ne-

braska, representing a client student of the Institute, and one of the defendants in the case, who was convicted and has not appealed, made reply to the lawyer in an impudent letter on the letterhead of the Institute. Counsel for the government laid undue emphasis in his argument upon this matter of impudence and the appellants here contend that there was error in the admission of the reply letter. The great number of letters from the Institute in evidence contain no trace of the impudence shown in the letter in question and the defendant who wrote the letter not having joined in the appeal, we can find no possible prejudice to any of these appellants in the receipt of the letter in evidence or in the undue emphasis put upon the writer's impudence in counsel's argument.

■ (d) Mr. James G. Yaden has been connected with the United States Civil Service Commission for many years and is thoroughly familiar with its functions and procedure. He was permitted without objection to describe the many kinds of government positions for which selections of suitable and qualified persons are made or recommended and in outline the methods used to those ends by the Commission. He detailed particularly the necessary qualifications and the investigation and examination of applicants for appointment to the government positions on the list of thirty-odd positions listed in the agents' manuals and as to which positions the Institute made the representation "We have complete training covering Civil Service Examinations". He had analyzed the Institute's correspondence course of instruction in elementary subjects and his testimony was positive that the course would not qualify a student to pass a Civil Service examination such as would enable him to secure an appointment to any of those positions. To that extent he was corroborated by Mr. DeMontreville who testified concerning the Institute, "We didn't undertake to train for a specific position or any with institutional training". It appeared, however, from the testimony of Mr. Yaden and the data given by him that there were some government positions under Civil Service as to which the education in elemental subjects would be a helpful factor in the applicant's favor, and Mr. Yaden gave his opinion concerning the extent to which the factor would be helpful to an applicant. Objection was made that such testimony amounted to expert opinion upon the ultimate issue in the case, which was for the jury. The many assignments and arguments on the point have been considered and are found to be without merit. Although the operations of the Civil Service Commission are governed by many laws, rules, regulations and customs, it was not necessary or feasible to produce them before the jury in this case. The trial court rightly held that Mr. Yaden had fully established his qualifications to testify to the general course followed by the Commission in the performance of its functions, and the opinion he expressed as to the weight which would be given on account of an applicant having taken the correspondence course was clearly competent.

■ (2) Testimony excluded. The point more seriously urged by appellants under numerous assignments is that the court excluded from the examination of Mr. Yaden many matters upon which extended offers of proof were made and refused. The excluded offers were to show, among other things, the extent to which the Civil Service has grown in the United States; that the government has become the largest single employer; that during the years 1936 and 1937 there was a large increase in the number of persons under the classified Civil Service by reason of laws pertaining to the Social Security Department of the United States; that there was a vast increase in the number of persons applying for Civil Service examinations and government positions; that correspondence schools of the same character as the Public Service Institute to the number of at least ninety had grown up and were in active operation; that the Civil Service Commission was hostile to their industry and Mr. Yaden was asked whether he had not been engaged in investigating various Civil Service schools with respect to possible prosecution.

It appeared that from time to time the Commission includes in its published notices of examinations to be held, lists of so-called sample questions intended to indicate the general nature of questions and the general field of knowledge touched upon in that part of the proposed examination. The defendants sought to make comparisons between questions picked from the Institute's course which was in evidence, and questions picked from such lists of sample questions published by the Commission. The examination along this line was restricted by the court.

It can not be maintained that any of these matters excluded by the court went directly to establish a defense or directly to rebut the testimony produced against the defendants. The matter contained in the offers was only remotely related to the accusation and proof against them. But it is urged that it was all competent and should have been received on the question of intent.

The rule that where intent is in issue in a criminal case the defendant must be protected liberally in his right to rebut the inference of criminal intent is fundamental, but where proffered testimony is collateral to the issue, or cumulative in nature, the trial court has a wide discretion in determining the extent to which the direct inquiry into the specific issues may be broadened out or departed from. In this case the trial extended over nearly six weeks and the abbreviated testimony of Mr. Yaden in narrative form includes about eighty printed pages. Many pages of the cross and recross examination of the witness were conducted with no objections by the government, and the right of cross-examination upon the matters to which he had testified in direct examination was fairly accorded. Our conclusion is that while some of the offers made in the cross-examination of the witness were not wholly irrelevant to the issues in the case, their tendency was to confuse rather than to clarify the issues and that the defendants were not deprived of any substantial defense evidence and that no matters of substance were kept from the jury by the exclusion of the proffered testimony. United States v. Socony-Vacuum Oil Company, Inc., 60 S.Ct. 811, 84 L.Ed. ——. Decided May 6, 1940.

Similar complaint is made of the exclusion of testimony offered in the examination of the defendant DeMontreville. Mr. DeMontreville took full responsibility for the organization advertising, contract forms, collection correspondence, hiring of salesmen and management of the Institute, and he instigated the representations that the personnel of the Institute were Civil Service experts and should be inquired of how to obtain government positions quickly, and supplied the designation of "advisors" to those sent out to solicit sales of the courses on commission. But he testified in answer to direct questions of the court that he had never seen any written Civil Service examination papers except those of his sister-in-law who had failed in her examination, and no person was shown to have been successfully trained for a government position by any one connected with the Institute. He denied that he or any one of the employees was authorized or knowingly permitted to represent that the Institute was connected with the government. It appeared that Mr. DeMontreville had been employed in the selling department of another correspondence school before he established the Public Service Institute, and while he was the head of the Public Service Institute he associated himself as a member of the Chamber of Commerce, the Better Business Bureau and the Association of Correspondence Schools, and the extensive use of the mails by the Institute occasioned contacts on his part with the officers of the Postal Department. In the course of his examination as a witness the defense offered a great mass of Reports of the Civil Service Commission and examination notices promulgated by it, publications by private authors concerning Civil Service examinations, prospectuses, advertisements and contract forms of other correspondence schools, and transactions, conferences and conversations between Mr. DeMontreville and the Better Business Bureau, the Chamber of Commerce committees, committees of the Association of Correspondence Schools and officers of the United States Post Office Department. It is not claimed that any of the proffered testimony tended to rebut the widespread deception of the public shown to have been carried on by the Institute and its agents in the sale of the enrollment contracts and in obtaining money from victims upon misrepresentations and the "money back guarantee" of government employment. All of the testimony was offered on the theory that it tended to show an honest belief on DeMontreville's part that the Institute could and would successfully train those who enrolled with it for Civil Service examinations and securing government positions.

Insofar as the proffers went to show that other correspondence schools were engaging in similar fraudulent practices to secure contracts identical with those used by the Institute, the court was clearly right in refusing to admit them. That others are violating the laws is no defense to the prosecution of an accused person. Whether the fact should be deemed

to extenuate or to aggravate a particular offense may be relevant to the punishment but not to the question of guilt or innocence. As to the literature on the subject of Civil Service examinations which Mr. DeMontreville claimed to have read and offered to have the jury read, we think the court acted well within the limits of its sound discretion in declining to enter into the proposed field of reading. Mr. DeMontreville was given fair opportunity to testify in behalf of himself and his associates as to the experience they had had and how they had gotten up the correspondence course and what it was and how it was advertised, represented and sold. There was no dispute that some questions in the correspondence course were in the same general field of knowledge as some of the questions in the lists of sample questions published by the Commission. But it was plain that buying and taking the course gave no assurance of obtaining the government positions specified in the enrollment contracts, or any other government positions, and nothing to justify a contrary conclusion has been pointed out in all the mass of exhibits proffered for the defense and brought up with the record. As to the conversations between Mr. DeMontreville and the Better Business Bureau, the Chamber of Commerce committee, committees of the Association of Correspondence Schools and officers of the Post Office Department, a similar irrelevance is present. The operations of the Public Service Institute as a whole were not known to the various persons with whom Mr. DeMontreville had conversations and from whom he sought approval of particular advertisements, contract forms or mailing matter of the Institute. Through the investigation for the government the course and conduct of the business was shown to the jury by direct and competent evidence. Such transactions between Mr. DeMontreville and other persons as were sought to be shown had no tendency to make it any clearer to the jury what the real business carried on by the Institute was, or what the real intent was on the part of those who carried it on. The court did not err in restricting testimony concerning transactions with outsiders within narrow limits.

Complaint is made that the court permitted the witness Burt, a Post Office inspector, to testify on rebuttal concerning a conversation had between Mr. DeMontreville and the inspector at the Post Office building in Saint Louis. Mr. DeMontreville had testified that he had talked and corresponded with the Post Office inspector in reference to the Institute's forms of enrollment contract and some of the advertising matter, and that the inspector had made certain suggestions for corrections but had generally indicated approval. When the inspector was called in rebuttal he gave a different version of the matter. He testified his conversations with Mr. DeMontreville had related to the use by the Institute of a certain Exhibit 524 which was said to be an envelope used in the distribution of advertising matter through the mails and which bore improper postage marking. The inspector said that Mr. DeMontreville had explained that the envelope with the markings had gotten into the hands of an employee through error and gave assurance that the advertising matter would be properly put out. On cross-examination by defendants it was brought out that the misuse of the post mark had been repeated and that the matter had been reported to the United States Attorney, who declined to prosecute.

The testimony concerning improper marking on envelopes used to distribute advertising was obviously not relevant to this prosecution, but no prejudicial error occurred. In substance, the inspector attempted to rebut the claim that he had spoken in approval of DeMontreville's contract forms or advertisements by admitting that he had a conversation with DeMontreville, but asserting that the matter talked about was the envelope markings and not the contract forms of advertisements. Having admitted that there was a conversation between himself and DeMontreville, it did not transcend the limits of rebuttal to let the witness give his version of what the real subject matter of the conversation was. An instruction might have been requested to eliminate any consideration of this irrelevant matter, but none was asked.

*Instructions.* The instructions given by the court were carefully considered and submitted the issues fairly and clearly. None of the defendants made any objections or took any exception to them. On being asked by the court if they had any suggestions to make, they made none. But refusal to give certain instructions requested by defendants is argued as a point for reversal. The substance of the contentions upon the point is that the court did

not sufficiently inform the jury (1) of the conditions upon which the testimony concerning statements made by salesmen would be binding on other defendants not then present or participating in the transaction, or (2) of the effect to be given to the testimony of defendants who testified in their own behalf, or (3) upon the presumption of innocence which each defendant was entitled to have accorded in his favor, or (4) upon the burden of proof and reasonable doubt, or (5) that the bringing of the indictment was not evidence, or (6) upon circumstantial evidence and its effect.

It is true the instructions as given upon each of the matters in question were not in the same words as those employed in the requests submitted. Such requests were prolix and included many different subjects in each instruction. But we think that the law on each of the subjects was properly and sufficiently declared, and that no necessary declaration was omitted. The point is not well taken.

As in most cases of this kind which have been earnestly and skillfully defended by able counsel, the assignments of error have been extended at great length and it would unduly prolong an opinion to discuss each and every contention urged for reversal. On full consideration, we find no error prejudicial to any appellant.

The penalties imposed were not excessive. The fraudulent scheme devised and carried on by DeMontreville and those associated with him was based on the general confidence in the government. The essence of it was to abuse that confidence by deceitfully inducing an understanding that the individuals in the enterprise had something to do with the vitally important governmental function of selecting government personnel, and to obtain money from their victims on that false pretense. When a fraud of that character is carried on by organized effort on a large scale as it was in this case, and the United States mails are used to further it, the gravity of the crime may not be minimized. It is the duty of the court to make it clear that even in the field of education, where private addition to the public effort is most to be desired, the rightful power and credit of the government may not be usurped or simulated by any individual for private gain.

Substantial evidence sustains the several convictions and the judgments are

Affirmed.