**MILLER et al. v. UNITED STATES.**

No. 9972.

Circuit Court of Appeals, Fifth Circuit.

Feb. 20, 1942.

Rehearing Denied March 24, 1942.

M. H. Myerson and Dillon Hartridge, both of Jacksonville, Fla., for appellants.

H. S. Phillips, U. S. Atty., of Tampa, Fla., and Damon G. Yerkes and W. A. Paisley, Asst. U. S. Attys., both of Jacksonville, Fla., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

Two joint indictments were returned against Harry Leaford Miller, Samuel Eugene Crosby, Jake Deese, Frank Deese, and Lee Cantrell. Indictment No. 6460-J was in six counts and charged that on March 7, 1941, the defendants were jointly engaged in illegal liquor operations in violation of the Internal Revenue Laws, 26 U.S.C.A.I.R.C. §§ 2803(a), 2810, 2833, 2834. Indictment No. 6461-J charged a conspiracy to violate the Internal Revenue

772

Laws in violation of 18 U.S.C.A. § 88. The indictments were consolidated for trial. Cantrell suddenly became ill at the opening of the trial, and a mistrial and severance was granted as to him. The other four defendants were tried and found guilty on all counts of the two indictments, and were each sentenced to serve terms of eighteen months in the penitentiary on the conspiracy count, and three years on the substantive counts; the three-year sentences to be suspended and the defendants placed on probation at the expiration of their first sentence. All defendants have appealed.

The evidence shows that on March 7, 1941, two officers of the Alcohol Tax Unit were driving toward Palatka, Florida, along Highway 17. Near the town of Bostick they noticed a disabled stake-bodied truck on the side of the road. The truck answered the description of a truck which was reported to be hauling large quantities of sugar, and the officers stopped their car and backed up to examine it. They found that the truck had run against the bank on the east side of the road, that a front spring was broken, and that a rear tire was blown out. The truck was loaded with sacks of sugar covered with bags of charcoal. While the officers were examining the truck, Lee Cantrell came out of the woods, and the officers asked him if there was anything they could do. "Cantrell said that men had gone to get another truck. There was a Georgia tag on the truck, said he was not from Georgia. The other fellows were from up around Jacksonville; that he caught a ride going south with them to spend a few days around Orlando."

The officers decided to shadow the truck, and they went to Palatka to enlist the aid of the sheriff and his deputies. Having secured help, the officers drove back by the truck and two of them went into the woods to watch. As the officers drove by the truck they saw Miller in a 1941 model pick-up truck parked nearby. They turned around and drove by the truck again, and Miller was on the ground talking to Cantrell. One of the officers saw a large stake-bodied truck driven by Frank Deese coming down the road. This truck stopped and backed up to the disabled truck, and the sugar and charcoal were loaded onto it. In the meantime Crosby had arrived on the scene in a new Buick sedan. The pick-up truck which had been near the

disabled truck was moved and parked two hundred yards away in the woods. Frank Deese and a negro unloaded the truck, and the evidence is in conflict as to whether Crosby aided in this operation, but it is without dispute that both he and Miller were on the scene. After the truck was loaded it was driven away by Frank Deese who was accompanied by Lee Cantrell. Crosby and Miller followed the truck in the Buick car. The truck passed through Palatka and stopped once to adjust the tarpaulin cover. The officers kept watch on the truck and the movements of Crosby and Miller and in order to avoid recognition the officers changed automobiles. The shadowing continued, and at the Shady Rest Tourist Camp three miles from East Palatka the Tax Unit officer and a deputy sheriff saw the Buick parked with Miller and Crosby in it. The Buick then "pulled in behind" and followed them. The officers then drove onto a side road near San Mateo and passed the truck, and when they came back to the highway they saw the truck coming with the Buick close behind it. After the truck and the Buick were "three-quarters of a mile down the highway", the officers began trailing them again. A mile south of the county line the truck pulled over to the side of the road and stopped at a pasture gate, and the Buick car passed it and proceeded down the road. The officers passed the truck and followed the Buick. After they had followed the Buick for some distance, Anderson, the Tax Unit officer, got out of the car and waited for the deputy sheriff to go further and turn around. Anderson could not see the truck from where he was standing. "The Buick came back headed toward the truck", but when the officers reached the pasture gate both the Buick and the truck were gone. They drove on and met the sheriff in his car, and they then saw the Buick coming back again at high speed with Crosby driving, and "Miller ducked down and sat real low". The sheriff then chased the Buick, and Anderson and a deputy sheriff went to the pasture gate and followed the wheel tracks of the truck for about one-half mile to a farm. When they reached the farm, they saw a barn seventy-five or one hundred yards from the farm house, and the dual wheel truck tracks led to the closed barn door.

The evidence further shows that after the officers reached the farm, Anderson

left the deputy on watch to prevent anyone from escaping; that Anderson then worked his way along an old wire fence toward the barn; that while going to the barn he smelled cooking mash and heard men talking; that the barn was boarded up and was encircled by a high chicken-wire fence; that he proceeded along this high fence until he was back of the barn where he could see inside through a small window or opening; and that when he looked through the opening he saw a large copper still which was in operation with steam coming from it. Having seen the still in operation, Anderson motioned to the deputy to come over to the barn. He then walked around to the front of the barn and announced that he was a federal officer and ordered the men to come out. Frank Deese came out and started out a little gate by the side of the barn and the deputy stopped him. Anderson then went into the barn and found Jake Deese and Lee Cantrell. Jake Deese said, "Hello, Mr. Anderson. Well, you see what I am doing." The still was in operation and whisky was running from the coil. In the barn there was found 145 gallons of untaxed whisky, 108 barrels with 96 of them full of mash, 400 empty sugar sacks, sugar, charcoal, sacks of rye, and the truck loaded with sugar and charcoal. The Deese boys and Cantrell were placed under arrest and were held at the barn for forty-five minutes until the sheriff came with Miller and Crosby who had been apprehended in the meantime.

When the sheriff arrested Crosby and Miller, Crosby gave his name as Jackson. When he was searched, a driver's license bearing the name of Tuttle was found and he said that was his name. He then told the sheriff Tuttle was his boss, "I guess I picked out the wrong name."

In Miller's pick-up truck the officers found the blown out tire from the disabled truck, and there was evidence that the tire used to replace it had been purchased by Miller early in the morning on March 7th. A sprinkling of sugar, rye, and charcoal was found on the floor of the truck, and under the floor mat there were three additional license plates. These license plates were identified in connection with the purchase of large quantities of sugar and rye, and it was further shown that Miller and Deese had from time to time purchased large quantities of sugar and rye under assumed names.

The connection of Frank Deese with the illegal liquor operations cannot be disputed, and in the argument before this court it was conceded by counsel that the record is without error as to him.

Jake Deese was found in the act of operating the illicit distillery, and the only contention on his behalf is that the officer Anderson was illegally on the premises, without a search warrant, and that the evidence offered against him was obtained as the result of an unlawful search. There is no merit in this contention. The barn was removed some one hundred yards from the house and was enclosed by a high chicken-wire fence, and the officer did not go into the inclosure until he had smelled the mash, heard the men talking, and had actually seen the still in operation.

Crosby and Miller assert that the evidence was insufficient to sustain their conviction and that their motion for a directed verdict should have been granted; that the court erred in admitting evidence of what Cantrell said to the officers at the truck, at a time when they were not present; and that the court further erred in refusing to let their counsel examine a paper which had been referred to by one of the government's witnesses.

There was no error in admitting Cantrell's statement. He was one of the principal actors in the illegal undertaking, and his statement to the officers was relevant as to what was then going on.

The witness West was testifying as to the address of a garage on West Church Street in Jacksonville where Miller rented storage space, and to make certain of the address he referred to a memorandum. It is without dispute that the address he gave was correct, and Miller admitted that he rented space at the garage. It was error to refuse defense counsel the right to examine this paper, but the error was harmless and without prejudice to the defendants. Taylor v. United States, 8 Cir., 19 F.2d 813.

Although the evidence as to Miller and Crosby was wholly circumstantial it was sufficient to sustain the verdict against them, and the court properly refused to give a peremptory instruction of not guilty.

The record is without reversible error, and the judgment as to each of the appellants is affirmed.