## HARPER v. UNITED STATES.

## BENNIGHT v. UNITED STATES.

### Nos. 12589, 12590.

Circuit Court of Appeals, Eighth Circuit.
June 30, 1944.

798

David H. Cannon, of Los Angeles, Cal. (Morris A. Shenker, of St. Louis, Mo., on the briefs), for appellants.

Harry C. Blanton, U. S. Atty., of Sikeston, Mo. (David M. Robinson, Asst. U. S. Atty., of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

Appellants, Carey Judson Harper and Elmer L. Bennight, together with one Robert Rucker, were indicted in an indictment containing nine counts. Counts 1, 2, 3 and 8 of the indictment charge substantive offenses for violation of the Securities Act, Section 77q (a)(1), Title 15, U.S.C.A., while counts 4, 5, 6 and 7 charge

substantive offenses for violation of the Mail Fraud Act, Section 338, Title 18 U.S.C.A. Count 9 charges a conspiracy to commit the substantive offenses described in the preceding counts, in violation of Section 88, Title 18 U.S.C.A. The scheme is set out and described in the first count of the indictment and by reference is incorporated and embodied in the other substantive counts. The counts alleging violation of the Securities Act allege that the device, scheme and artifice was to defraud, while the counts charging violation of the Mail Fraud Act charge that the scheme was to defraud and to obtain money and property by means of false pretenses, promises and representations. The ninth count alleges a conspiracy to commit the offenses charged in the substantive counts of the indictment, charging that the three defendants named, as well as other named persons not indicted, entered into the conspiracy.

The indictment was returned June 29, 1942. On March 20, 1943, the date set for hearing, appellant Harper appeared specially and interposed a motion for continuance. The motion was denied. Rucker pleaded nolle contendere. Appellants Harper and Bennight each interposed a demurrer to all the counts of the indictment, which were overruled, and they then entered pleas of not guilty. Appellants waived trial by jury and trial to the court began March 23, 1943. The trial consumed several days, resulting in conviction of each of the appellants upon all nine counts of the indictment. Harper was sentenced to serve five years on counts 1, 4, 5 and 8, to run concurrently with each other, and five years on counts 2, 3, 6 and 7, to run concurrently with each other but consecutively to the sentences imposed upon counts 1, 4, 5 and 8. He was also sentenced to serve a term of two years on the ninth count, this sentence to run concurrently with the sentences imposed under the other eight counts, making a total of ten years imposed upon Harper. Bennight was sentenced to serve two years on each count, the sentences to run concurrently.

■ Each appellant has appealed separately. A joint assignment of errors, a joint transcript of the record and a joint brief have been filed, supplemented by an additional brief filed on behalf of the appellant Bennight. In their joint brief, the grounds upon which appellants seek reversal are stated as follows: (1) Error in denying appellants' motion for continuance; (2) insufficiency of the indictment; (3) errors in rulings on evidence, (a) improper admission of evidence on matters outside the scope of the indictment, (b) rulings preventing proper cross-examination of appellee's witnesses, (c) improper admission of hearsay evidence, (d) improper admission of documentary evidence and of testimony based thereon; (4) errors in excluding evidence offered by appellants. In addition to the foregoing questions, it is urged by appellant Bennight in a separate brief that the evidence was insufficient to warrant his conviction. Each appellant appeared by separate counsel. While it is recited in the joint brief that the motion of appellant Harper for a continuance was joined in by appellant Bennight, the record shows that the motion was made solely and independently by Harper. No severance had been granted nor asked, and there is nothing in the record to indicate that Harper's codefendants were desirous of a continuance. In these circumstances he could not properly apply for a continuance as to himself alone. If granted, it would operate as a continuance of the entire case. This could not properly be done as we must assume that the other defendants were ready for trial and they were entitled to a speedy hearing.

■ The ground upon which appellant Harper sought a continuance was that he had not, prior to March 18, 1943, been furnished a complete copy of the indictment and that his attorneys had not had an opportunity to prepare for trial. The indictment was returned June 29, 1942. On October 21, 1942, Harper, through his attorney, requested that he be permitted to give bond in the State of Oklahoma. On October 23, 1942, he, with his attorney, appeared before a United States Commissioner at Holdenville, Oklahoma, for the purpose of giving bond for his appearance. There was filed before this Commissioner a fugitive complaint, to which was attached a complete certified copy of the indictment. He and his attorney might, if they desired, have examined the indictment. Following the giving of this appearance bond, and on October 29, 1942, Harper's Oklahoma attorney, Walter Billingsley, wrote the United States Attorney at St. Louis, Missouri, requesting a copy of the indictment. In response the United States Attorney sent Mr. Billingsley, under date

November 2, 1942, a complete copy of the indictment, except that the names of the alleged conspirators, including the defendants and appellants, had been deleted. On November 5, 1942, Mr. Billingsley, representing Harper, acknowledged receipt of the copy of the indictment, making no complaint whatever as to the deletions that had been made therefrom. No further request was made upon the United States Attorney, nor upon the clerk of the court where the indictment was filed until March 18, 1943. This was four days prior to the date set for the trial. In the meantime, on February 18, 1943, Billingsley wrote the United States Attorney at St. Louis, requesting a resetting of the case from March 22, 1943. The United States Attorney answered, saying that the government could not agree to a resetting, and nothing further was heard from Mr. Billingsley. On March 8, 1943, David H. Cannon, an attorney at Los Angeles, California, telegraphed the United States Attorney at St. Louis that he was representing Harper, and asked for a two weeks' postponement of the case. The United States Attorney telegraphed Mr. Cannon that he could not consent to a continuance. On March 18, Harper's attorney, Cannon, requested of the clerk permission to see the original indictment and was informed that he could not see it without the consent of the United States District Attorney because it was "suppressed." Cannon then requested the United States Attorney for permission to see the indictment and the clerk was thereupon instructed to allow Cannon to examine the indictment. Owing to the lateness of the hour he was unable to make the examination until the morning of March 19, 1943.

So far as this ground for continuance is concerned, the short answer would seem to be that the government was under no obligation to furnish Harper with a copy of the indictment. Section 562, Title 18 U.S.C.A., provides that when any person is indicted for treason, a copy of the indictment, a list of the jury and of the witnesses to be produced on trial, with certain other information shall be delivered to the defendant at least three entire days before he is tried, and that when a person is indicted for any other capital offense a copy of the indictment and a list of the jurors shall be delivered to him at least two days before the trial. Section 562a, Title 18 U.S.C.A., provides that: "In each criminal case not provided for in section 562 of this title the clerk shall furnish each defendant, upon his request, a copy of any information filed or indictment returned against him, the fees for said copy and the certificate thereto, at the rates provided for by law, to be taxed as costs * * *."

It does not appear that Harper ever requested a copy of the indictment from the clerk, nor was there a refusal to furnish him such copy. Taylor v. Hudspeth, 10 Cir., 113 F.2d 825. It is conceded that present counsel for Harper saw the original indictment on the morning of March 19, 1943. The trial did not formally commence until March 23, 1943. It is observed that even in a capital offense, other than treason, the defendant is entitled to be furnished with a copy of the indictment "two entire days before the trial." Harper already had a copy from which had been deleted the names of the co-conspirators and the other defendants. Hence, when his attorney examined the original he had only to fill in the names that had been thus deleted. In any event, he at no time complied with the plain requirements of Section 562a by requesting that the clerk furnish him a copy of the indictment.

■■ The second ground of the motion was that counsel had not been able sufficiently to familiarize himself with the facts of the case to defend Harper at the trial. Harper had given bond on October 23, 1942, at which time he was represented by Oklahoma counsel so that he had approximately five months within which to prepare for trial and to inform counsel whom he had selected as to the facts in the case. His Oklahoma attorney was advised on February 18, 1943, that the government would not consent to a postponement of the trial and counsel who finally appeared for Harper at the trial was advised on March 8, 1943, that the government would not consent to a continuance of the case. We do not think Harper could create grounds for a continuance by employing counsel from a distant state at a late date, who might not be familiar with the facts in the case, to represent him. There is nothing in the record to indicate that Mr. Cannon was the only available competent counsel, and in fact, other local counsel appeared with Mr. Cannon to present the motion for continuance.

Motions for continuance are addressed to the sound discretion of the court and

the court's denial of such a motion will be reversed only in the event of an abuse of discretion. Goode v. United States, 8 Cir., 58 F.2d 105; LaFeber v. United States, 8 Cir., 59 F.2d 588; Isaacs v. United States, 159 U.S. 487, 488, 16 S.Ct. 51, 40 L.Ed. 229. There was no error in denying the motion of appellant Harper for a continuance.

Both appellants interposed demurrers to the indictment. They contend that their demurrers should have been sustained because it is not charged in counts 1, 2, 3 and 8 that they converted or intended to convert the money or property obtained or intended to be obtained by the scheme or artifice to defraud or to profit from any such scheme. It is also urged that the so-called security counts are defective because it is not charged in these counts that any sale of securities was made by the use of means or instruments of transportation in interstate commerce. It is urged that both the security counts and the mail fraud counts are bad because the scheme to defraud is not alleged with sufficient definiteness and certainty.

Count 1 of the indictment charges that the defendants from on or about March 1, 1940, up to the date of the return of the indictment, devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false pretenses, promises and representations from certain named persons and diverse and sundry other persons. The scheme and artifice is then set out with particularity and detail, comprising three printed pages of the record. It then charges that on or about July 18, 1940, defendants employed the scheme and artifice set out in the indictment to defraud in the sale of securities by the use of means and instruments of transportation in interstate commerce by transporting in an automobile themselves and certain named persons to be defrauded. Except as to date and places to and from which transported, count 2 is identical with count 1, as is also count 8.

 Count 3, which is one of the security counts, alleges that in furtherance of the scheme to defraud in the sale of a security, defendants caused to be transmitted in interstate commerce a telegram to a named party from St. Louis, Missouri, to Oakdale, Tennessee, by the Western Union Telegraph Company, in accordance with the directions and address thereon.

A copy of the telegram is set out and embodied in this count of the indictment. Concerning this count, counsel for appellants in their brief say: "We concede that the telegram mentioned in count 3 is a 'prospectus' as defined in Section 77b (10) of Title 15, U.S.C. [15 U.S.C.A. § 77b (10)] * * *." As to this count it can not therefore be urged that it does not charge that a sale of securities was accomplished by use of means and instruments of transportation in interstate commerce.

 The failure of the security counts to charge that defendants intended to convert the money or property obtained to their own use does not render these counts insufficient. This Securities Act deals with a wrongful purpose or design to injure, with which the scheme or artifice must be connected. Horman v. United States, 6 Cir., 116 F. 350; Harris v. Rosenberger, 8 Cir., 145 F. 449, 13 L.R.A.,N.S., 762. We have in effect held in mail fraud cases that the proof need not show that the defendant intended to appropriate the money to his own use, nor is it material whether the scheme were successful or unsuccessful. Barnes v. United States, 8 Cir., 25 F.2d 61; Nelson v. United States, 8 Cir., 16 F.2d 71; Chew v. United States, 8 Cir., 9 F.2d 348; Cochran v. United States, 8 Cir., 41 F.2d 193; Baker v. United States, 8 Cir., 115 F.2d 533. What need not be proved need not be charged in the indictment. To charge that one devised a scheme or artifice to defraud implies that he intended to get another's property from him by cheating. In the mail fraud counts it is charged that the scheme was one to obtain money and property by false pretenses, representations and promises. The contention that either or any of the counts of the indictment are bad for not alleging that defendants intended to appropriate the money or property to their own use is wholly without merit.

 We shall next consider the contention that the scheme and artifice to defraud is not charged with sufficient definiteness and certainty. The devising of a scheme or artifice to defraud or to obtain money by means of fraud or false pretenses is not a crime either under the Securities Act or the Mail Fraud Act. It becomes a crime only in the event that in furtherance of the scheme or artifice to sell securities any means or instruments of transportation or communication in interstate commerce or the mails be employed.

Under the Mail Fraud Act it becomes a crime only in the event the United States mails are used in carrying out the scheme. The use of the United States mails or means or instruments or transportation or communication in interstate commerce in execution of the alleged scheme to defraud is the gist of the offense which these statutes denounce and not the scheme to defraud. Cochran v. United States, supra; Baker v. United States, supra; Holmes v. United States, 8 Cir., 134 F.2d 125; Busch v. United States, 8 Cir., 52 F.2d 79. The scheme and artifice to defraud is not required to be set forth with that particularity which would be required if the scheme were the gist of the offense. It need only be set out in sufficient particularity to advise the defendant with what he will be confronted at the trial. Cochran v. United States, supra. As we have already observed, the scheme is set out in the indictment in great detail. It contemplated defrauding certain named victims and other unknown victims of money and property by selling to them various worthless evidences of indebtedness described in the indictment, also stocks of certain corporations and interest in oil and gas leases. It sets forth in detail the misrepresentations alleged to have been made by the defendants to the victims and alleges wherein the representations were false and that defendants knew such representations were false. It would unduly lengthen this opinion to set out the allegations with reference to the misrepresentations made and their falsity. The objects of an indictment are (1) to furnish the accused with such a description of the charge against him as will enable him to make his defense and avail himself of a conviction or acquittal for protection against further prosecution for the same offense and (2) to inform the court of the facts alleged so that it may decide whether they are sufficient in law to support a conviction if one should be obtained. Holmes v. United States, supra; United States v. Hess, 124 U.S. 483, 8 S.Ct. 571, 31 L.Ed. 516. As said by us in Hewitt v. United States, 8 Cir., 110 F.2d 1, 6: "The sufficiency of an indictment should be judged by practical, and not by technical, considerations. It is nothing but the formal charge upon which an accused is brought to trial. An indictment which fairly informs the accused of the charge which he is required to meet and which is sufficiently specific to avoid the danger of his again being prosecuted for the same offense should be held good."

■ The indictment here we think fully advised defendants as to the charges against them, but if further particulars were desirable they should have demanded a bill of particulars and this they did not do. Cochran v. United States, supra; Chew v. United States, supra. The fact that defendants made no such demand would indicate that the present claim that the indictment did not sufficiently advise them as to the particulars of the offense charged is an afterthought.

■ We find it unnecessary to consider the contention that under the Securities Act there must be an actual attempt to offer the security either by the transportation in interstate commerce of the "prospectus" or of the "security" itself, as those terms are defined in Section 77b (1, 3, 10) Title 15 U.S.C.A. Conceding without deciding that this contention is sound, it can not affect the result in this case because counts 3, 4, 5, 6, 7 and 9 are, we think, undoubtedly good. Both defendants were convicted on all counts. Harper was sentenced to serve five years on counts 1, 4, 5 and 8, to run concurrently with each other, and five years on counts 2, 3, 6 and 7, to run concurrently with each other but consecutively to the sentence imposed upon counts 1, 4, 5 and 8. He was also sentenced to serve a term of two years on count 9, said sentence to run concurrently with sentences imposed under the other eight counts, making a total of ten years imposed upon him. The sentences are sustained by the valid counts and hence, if there was error, it was without prejudice. Under the same rule the sentences of two years imposed upon appellant Bennight are likewise sustained by the counts of the indictment which we hold to be good and are not excessive. We conclude that the defendants were not prejudiced by the overruling of their demurrers to the indictment.

■ The next group of assignments of error has to do with the rulings of the court on the admission of evidence. These assignments of error do not comply with the requirements of Rule 11(b) Fourth of this court, which provides that appellant's brief shall contain "A separate and particular statement of each assignment of error * * * relied upon, intended to

be urged, with the record page thereof. If an error assigned or point relied upon relates to the admission or exclusion of evidence, the statement shall quote the evidence referred to and the pertinent objections or exceptions taken, together with the rulings of the court thereon, giving the pages of the printed record on which the quotations appear." The asserted errors are not entitled to detailed consideration of this court. Butler v. United States, 8 Cir., 108 F.2d 27; Marx v. United States, 8 Cir., 86 F.2d 245; Greenberg v. United States, 8 Cir., 297 F. 45; Turner v. United States, 8 Cir., 32 F.2d 126; Mill Owners Mutual Fire Ins. Co. v. Kelly, 8 Cir., 141 F.2d 763; Cohen v. United States, 8 Cir., 142 F.2d 861. In this connection it is to be observed that in this case appellants waived trial by jury. Where an action at law is tried before a court, error in receiving evidence over objection is ordinarily regarded as harmless and not grounds for reversal. English v. Gamble, 8 Cir., 26 F.2d 28; Lahman v. Burnes Natl. Bank, 8 Cir., 20 F.2d 897. In criminal cases involving life or liberty of the defendant, an appellate court may notice plain and seriously prejudicial error in the trial even though not properly assigned as error. McNutt v. United States, 8 Cir., 267 F. 670. So far as the rulings complained of go to testimony which was received over defendants' objection, great liberality is indulged by appellate courts in reviewing the rulings of the trial judge as to evidence to show attendant circumstances.

 We shall note but generally the group of alleged errors in receiving evidence. The first is the claim that the evidence received was outside of the scope of the indictment. It is asserted in the brief of appellants that testimony was improperly received in cross-examination of the witness Harper to the effect that in 1939 he was an incorporator of a company in New Mexico and sold stock therein and that this company handled the automatic water bleeder, the stock in that company not being one of the securities alleged to have been fraudulently dealt in by defendants. The purport of this testimony was that Harper did not sell any stock in the Automatic Water Bleeder Company. He was finally asked if he sold $20,000 of that stock at Dubuque, Iowa, to which he answered, "I don't think you can consider it the sale of stock. I took the man in as a partner in this Automatic." He was asked if he got $20,000 for it, and there is no answer. Although this was not the offense under investigation, the trial court in its discretion properly admitted testimony of the activities of appellants. Even independent transactions may be shown to prove intent and solicitation. Roper v. United States, 10 Cir., 54 F.2d 845. In admitting testimony of attending circumstances, especially in cases involving allegations of fraud, much is left to the discretion of the trial court. Hartzell v. United States, 8 Cir., 72 F.2d 569. Evidence outside of the scheme charged may be admitted which tends to elucidate or clarify false statements for the purpose of showing intent. We have laboriously searched the record and are of the opinion that the testimony objected to as referring to matters outside the scope of the indictment was admissible.

 It is next contended that the court unduly restricted cross-examination of certain government witnesses. One of the victims, Cecil Clyde Goff, is said by appellants to have testified to a certain date by reference to a memorandum and it is urged that the denial of a request by counsel for defendants to see the memorandum constituted reversible error. The record is very obscure as to what appellants desired to see. Assuming that the record is as contended by appellants that a memorandum was used to fix a date, the error, if any, would seem to be harmless. Taylor v. United States, 8 Cir., 19 F.2d 813; Miller v. United States, 5 Cir., 126 F.2d 771.

 The witness Craig was asked on recross-examination, "Can you name one contract that you have endorsed on which Hercules is obligor?" Counsel for the government said, "I objected to it and the court sustained it." Counsel for appellants inquired, "I can not cross-examine him about it?" to which the court responded, "No." Just before these questions and answers the witness testified on recross-examination: "Up to this point I had lost twelve thousand dollars in cash and I still owe about thirty-eight thousand dollars; I and the corporation. I am the personal endorser of thirty-one thousand dollars. I have not personally guaranteed the outstanding debts of Hercules." Whether Craig had endorsed any of the Hercules contracts was not material to the charges in the indictment and the court in its discretion properly sustained the objection. Craig testified on cross-examination that he was connected with the Na-

tional Life & Accident Insurance Company, one of the companies whose securities were mentioned in the indictment. Objections to questions put to him on cross-examination as to the assets of the company and whether he told Harper at the time he was associated with Hercules that this National Life and Accident Insurance Company had assets in excess of $80,000,000 and that Craig and his family owned the company, were sustained. Defendants then made an offer to prove that Craig had represented to Harper that this company owned assets in excess of $80,-000,000; that "the National Life and Accident Insurance Company was owned by his family, and they had assets in excess of $80,000,000.00." One of the false representations charged in the indictment was "That the people behind the Hercules Producing & Refining Company had $80,000,-000.00 behind them." Accepting the offer of proof as indicative of what the witness would have said, it would at best indicate that Craig's family owned the company. This would not mean that Craig owned it, nor would it mean that anyone owning an interest in the company was behind the Hercules. There was no prejudicial error in sustaining the objection.

■■ The next group of assignments relates generally to the alleged improper admission of hearsay evidence. Hazel Kane, the divorced wife of Harper, and charged in the indictment to be one of the conspirators though not indicted, borrowed $500 from the Depositors State Bank of Oakdale, Tennessee, upon her promissory note endorsed by Dr. Gallion who paid the note. The question was whether Hazel Kane secured a loan from the bank. The objection was that the question was immaterial. Such an objection is not sufficient to raise the question that the interrogatory called for hearsay. Hazel Kane was introduced to Gallion as a cousin of Harper and was used as a decoy to victimize Gallion in the carrying out of the scheme. A great part of the $500 was paid over to Harper. This was not hearsay but an act of a conspirator in carrying out the object of the conspiracy and it was binding on all the conspirators.

■ Evidence was admitted indicating that Maurice Gillespie, one of the victims, borrowed money with which to make an investment in the stock of the St. Louis Oil Producing & Refining Company and a bond of that company. The transaction seems somewhat involved as Gillespie and his wife gave Harper a six months' note for $500 and as they felt they could not meet it in six months, they wished to pay it in monthly installments of $30, to which Harper demurred. One Kushnir purchased the $500 note from Harper. The objection was that this was hearsay. The short answer to this would seem to be that it was clearly not prejudicial even if hearsay and hence is not grounds for reversal. The important fact was that Gillespie became a victim of the fraud and was induced by the acts of appellant Harper to part with his money because of that fraud. The testimony was by a witness having knowledge of the fact and hence it was not hearsay.

■ Harper gave Mrs. Goff a mortgage on a 3,700 barrel oil tank in Bridgeport, Illinois, to secure payment of a note for $7,500 payable thirty days after date with interest. The transaction occurred October 29, 1940. Mrs. Goff testified that she did not know what became of the oil tank and realized nothing from it. This evidence was admitted without objection. The government then showed that a forged release of the mortgage was delivered to the purchaser from Harper. Harper purchased the tank for $550, sold it for $300, and the purchaser resold it for $625. We can not agree with counsel that the evidence of this transaction was irrelevant. Harper was constantly borrowing from and purporting to give security to Mrs. Goff. The trial court in its discretion properly concluded that this transaction in its entirety would aid in determining the guilt of the defendants as to the crimes charged. The resale of the tank for $625 was some evidence of the value of the security on which Harper had borrowed $7,500.

It is next contended that the court erroneously admitted certain documentary evidence and testimony based thereon. Mr. Wuest, who was secretary of the St. Louis Oil Producing & Refining Company, whose securities were being bartered and sold by defendants to their victims, testified that shortly after the incorporation of the company August 24, 1940, Harper authorized him to purchase a set of books. He then testified: "Since to open a set of books you need opening entries, I requested such entries from Harper, which

he promised from time to time to turn over. However, they were never turned over."

The refinery operated from the last week in December, 1940, to January 17, 1941. Wuest testified that he kept a set of analysis sheets from time to time supported by some invoices. In the latter part of January, 1941, the Hercules Producing & Refining Company took over the St. Louis Oil Producing & Refining Company. Exhibit 21 was identified by the witness as a folder containing copies of checks issued in the office of the St. Louis Oil Producing & Refining Company, together with an analysis of the checks issued. All checks were required to be signed by Harper and he could write checks without the cosignature of any other person but all checks of other officers had to be signed by Harper as well. Harper picked up cancelled checks at the bank. Exhibit 22 was identified as a folder containing a number of sheets reflecting a statement of sales made by the St. Louis Oil Producing & Refining Company, together with invoices and credit remittance advices from the Apex Oil Company, its broker of refined oil, showing amount of sale, price and commissions retained by the Apex Company for their services in selling the product. Wuest testified: "As auditor and secretary of the company I would take and keep the invoices as they came in and the analyses sheet in this exhibit was made up from the actual tax manifest." He also testified: "These yellow journal sheets were made from time to time as the invoices came in, some in my handwriting and some in other bookkeepers' handwriting under my supervision." He also testified that they were made in the regular course of business. Exhibit 23 was described by the witness as follows: "Exhibit 23 is an envelope containing a number of documents and papers of several kinds, including a group showing a form of yield, such as percentage of gasoline, kerosene, distillate, gas, oils and fuel oil. This sheet was made up by one of my assistants. Another one was made up by me. Here is a group of papers pertaining to the personnel of the organization. This one shows the payroll of one Daniels and approved by Stribling. These papers were turned over to me to be paid by me. Here is a sheet showing the number of barrels of oil received by the St. Louis Company from December 28, 1940 to January 12, 1941. These records were partially made by Mr. Young and myself, and are calculated from the tickets and attached thereto."

Exhibit 24 was a folder containing a number of letters to the company and copy of letters written by it. Exhibit 25 was a folder consisting of an analysis sheet and a number of bills submitted to the St. Louis Oil Producing & Refining Company. Exhibit 26 contained invoices for crude oil purchased by the St. Louis Oil Producing & Refining Company from Central Pipe Line, together with drafts drawn by the latter on the Salem National Bank against the St. Louis Oil Producing & Refining Company through the Tower Grove Bank in St. Louis. It also contained invoices from the Apex Oil Company for oil sold to the St. Louis Oil Producing & Refining Company, freight bills covering the shipments, and a notice of demurrage. Exhibit contained paid bills of the St. Louis Oil Producing & Refining Company. Exhibit 27 contained paid bills of the St. shipments of oil from the St. Louis Oil & Refining Company.

These were the original records kept by the St. Louis Oil Producing & Refining Company and apparently were the only records kept by that company, which company was the vehicle through which it is charged appellants perpetrated many of their astounding frauds. They were identified by an officer of that company who was their custodian. Section 695, Title 28 U.S.C.A., provides: "In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term 'business' shall include business, profession, occupation, and calling of every kind."

806

The purpose and effect of this statute is to make admissible any writing if made in the regular course of any business without the strict proof of authenticity which had theretofore been required. Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719. These exhibits represented all the records kept by the company whose stocks and bonds appellants had been active in selling. They tended to prove the contention of the government that the concern was operated as a stock selling scheme and not as a legitimate business. They tended to show the nature and extent of the operations of the company as against one dominating and using it. They were not hearsay but constituted proof of the condition of the company. Lewis v. United States, 9 Cir., 38 F.2d 406. The suggestion that the records were not in the same condition as when prepared is not only not sustained by the record but no such objection was interposed in the trial court.

The testimony of the witness James A. King, an expert accountant who summarized and analyzed the records of the St. Louis Oil Producing & Refining Company, was based on the records thus produced and offered in evidence, as well as upon the testimony of the witnesses he heard in open court. He testified as to the accounting features, the money realized and spent. The testimony of the victims or investor witnesses relative to the contributions made by them to the scheme was undisputed. The testimony simply assisted the court in interpreting the evidence from an accounting standpoint. It was not error to receive it, especially in a case being tried to the court without a jury. Foshay v. United States, 8 Cir., 68 F.2d 205; Gantz v. United States, 8 Cir., 127 F.2d 498; Burdick v. Mann, 60 N.D. 710, 236 N.W. 340, 341, 82 A.L.R. 1443.

It is urged that the court erred in rejecting certain offers of proof proffered by appellants. They offered to prove by cross-examination of the witness Goff that she turned over to Craig the three $600 checks, in addition to the other matters she testified to; that she turned over to him all the bonds she received, all the St. Louis Oil Producing & Refining Company bonds, and the original contract of September 14, 1940. The offer was refused. The checks mentioned were signed by Harper, payable to the order of Mrs. Goff, drawn on the account of the St. Louis Oil Producing & Refining Company in the Tower Grove Bank & Trust Company, St. Louis. They had not been paid. The contract of September 19, 1940, was between Mrs. Goff and Bennight. It recited that she had loaned Bennight, Harper and Kroder $40,000, and that Bennight desired to make settlement with her; that he had delivered to her 1,000 shares of stock, and bonds of the St. Louis Oil Producing & Refining Company of the par value of $40,000, which were personally owned by him; that Mrs. Goff released Bennight, Harper and Kroder "from any and all claims and demands" arising from their transactions. The proffered testimony as part of the cross-examination was wholly without probative value. It was certainly immaterial what Mrs. Goff did with these instruments. In any event the witness Craig testified to substantially these same facts so that the exclusion of the proffered evidence could not well be urged as prejudicial.

Appellants offered in evidence a number of documents pertaining to the water bleeder and transactions connected with that instrumentality, but sale of an interest in the water bleeder was not charged as an offense in the indictment. The evidence would simply encumber the record and did not tend to show that Harper did not have an interest in the bleeder. In a long trial involving many classes of evidence, circumstantial and otherwise, especially where the trial is to the court without a jury, much must be left to the discretion of the trial judge.

It is finally contended that the court erred in refusing to admit certain evidence as to alleged statements made by third parties to appellant Harper about prospective or possible earnings of the St. Louis Oil Producing & Refining Company. In the circumstances disclosed by the record here, such statements were properly refused. There was no evidence indicating an honest intention or effort to operate the company as a legitimate business. The record here is of men who desired to make easy money by juggling stocks and bonds and using the Refining Company as a means of getting money from investors. Appellants were not entitled to the benefit of what the honest and industrious could do with this property. They very obviously used the property as a method of attracting money which when acquired was not used to promote the re-

finery as a going concern. As said in Grell v. United States, 8 Cir., 112 F.2d 861, 876: "Such transactions * * * had no tendency to make it any clearer to the jury what the real business carried on by the Institute was, or what the real intent was on the part of those who carried it on."

Appellants are not prosecuted because of business failure but because they used the company and its apparent business as a fraudulent means of getting money from persons to whom they sold stocks and bonds in the belief that they were making prudent investments. They were engaged in selling securities on representations which were false, with no intention of using the money in connection with the business. Harper was permitted to testify to everything he did and to the steps he took to investigate the matter. The alleged statements of these third parties were properly excluded. Kercheval v. United States, 8 Cir., 12 F.2d 904; Busch v. United States, supra; Warfield v. United States, 5 Cir., 36 F.2d 903.

 It is separately urged by appellant Bennight that it was error to deny his motion for a directed verdict interposed at the close of all the evidence. The motion was as follows: "At this time may the record show that the defendants jointly and severally as to each count separately and as to the whole indictment generally, at the conclusion of the entire evidence of the case, move the court to dismiss each and every county." It is observed that the motion states no grounds on which it is based. Such a motion is not sufficient to entitle appellant to review the question of the sufficiency of the evidence. Mansfield Hardwood Lbr. Co. v. Horton, 8 Cir., 32 F.2d 851; Williams Bros. v. Heinemann, 8 Cir., 51 F.2d 1049; Standard Accident Ins. Co. v. Rossi, 8 Cir., 52 F.2d 547. A reading of the record convinces that the contention is wholly without merit. It is contended that appellant Bennight did not participate personally in certain acts charged in the indictment and that he did not cause to be delivered or deposited any of the mail matter mentioned and that he did not have anything to do with the preparation and sending of the telegram referred to in the indictment, or with the trip of Craig described in count 8, but it appears by abundant evidence and from convincing circumstances that he con-

spired with the other named defendants to perpetrate the crimes charged in the indictment. Not only was he one of the conspirators but he was a most skilled agency in the carrying out of the conspiracy by which he effectively, without subjecting himself to the hazards of a highwayman, relieved the innocent, confiding and more or less gullible victims of their money. Being a party to the criminal conspiracy he became bound by all the acts of any one of the conspirators, performed in furthering the scheme or purpose of the conspiracy during its existence. Cochran v. United States, supra; Alexander v. United States, 8 Cir., 95 F.2d 873; Chambers v. United States, 8 Cir., 237 F. 513.

 The evidence of the guilt of the defendants is overwhelming and we are clear that they had a fair trial and that no error prejudicial to either of them was committed by the trial court. The judgments appealed from are therefore affirmed.