James E. LITTLE, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17401.

United States Court of Appeals Eighth Circuit.

May 6, 1964.

Rehearing Denied June 3, 1964.

Samuel Raban, St. Louis, Mo., Raymond M. Briggs, Memphis, Tenn., for appellant.

John A. Newton, Asst. U. S. Atty., St. Louis, Mo., Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., and Mahlon M. Frankhauser and William D. Goldsberry, Attorneys, Securities and Exchange Commission, Washington, D. C., for appellee.

Before VAN OOSTERHOUT, RIDGE and MEHAFFY, Circuit Judges.

RIDGE, Circuit Judge.

Appellant was convicted on eight (8) of the ten (10) counts of an indictment duly returned, charging violations of Section 17(a) of the "Securities Act of 1933."[1] 15 U.S.C.A. § 77q(a). He appeals from concurrent sentences imposed therefor. Two counts of the indictment

---

[1]. 15 U.S.C.A. § 77q(a): "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

were dismissed by the Government before their submission to the jury.

The primary issue raised and to be resolved in this timely appeal relates to the "use of the mails, directly or indirectly" to bring appellant's violations of the Securities Act, supra, as a crime within federal jurisdiction. As that issue is here presented there is no question as to the sufficiency of the evidence to establish fraudulent representations as having been made by appellant to induce certain identified investors to purchase specifically described worthless "securities" [2] as detailed in each count of the indictment on which he was found guilty. Hence it is sufficient to presently state that on the evidence adduced, the Government established facts from which the jury could have found, beyond a reasonable doubt, that appellant, at all times here material, did knowingly and intentionally make certain false and untrue statements to induce identified investors, living in St. Louis County, Missouri, who had checking accounts with banks situate in that State, to deliver to him checks drawn on such banks, payable to the Star Oil Company, as a means of purchasing worthless, fractional interests in oil and gas leases, described as "Blackburn Leases A and B," located in Green County, Kentucky. None of the material representations established as inducing such investors to make those purchases were true. As a consequence, appellant was duly indicted for violation of Section 17 (a) of the Securities Act, supra.

In each count of the indictment returned, it was specifically charged, among other things, that appellant by the use of the means and instruments of transportation and communication in interstate commerce did—"unlawfully, willfully and knowingly—employ (a) device, scheme and artifice to defraud and obtain money and property" from the person duped, by "unlawfully, willfully and knowingly" causing a check, identified in each count of the indictment, "to be delivered by the means and instruments of transportation in interstate commerce—from Memphis, Tennessee, to Federal Reserve Bank of St. Louis, St. Louis, Missouri,"—payable against the account of the duped investor—which check appellant "deposited with the National Bank of Commerce in Memphis, Memphis, Tennessee," (hereinafter called "National") all "in violation of Section 77q(a)" supra.

■ It was on February 9, 1959, that appellant opened a checking account under the name of Star Oil Company [3] with National. Each of the checks received by appellant from the duped investors was, by false representation, made payable to "Star", at the specific direction of appellant and accordingly deposited by him in "Star's" checking account. Though appellant admittedly transported such checks from St. Louis, Missouri, to Memphis, Tennessee,—to bring him criminally within the ambit of Section 17(a), supra, each count of the indictment only charged a "transportation in interstate commerce" of each such check by "means and instruments of transportation and communication in interstate commerce—from Memphis, Tennessee, to St. Louis, Missouri." The various counts of the indictment alleged the transportation to be either via the

---

2. "Fractional undivided interest in oil" leases. § 77b(1), T. 15 U.S.C.A.

3. The Star Oil Company was organized February 7, 1959. Its incorporators were three attorneys in the office of counsel employed by appellant to secure the incorporation of Star. The record before us is silent as to the capital structure, if any, of Star at time of incorporation. The stock record book of Star, introduced as an exhibit, reveals one certificate for 1,000 shares, issued in the name of appellant, but "never actually executed" by any officer of Star.

From the testimony of appellant it appears that he was president and his wife was secretary. Obviously, the "doctrine of corporate alter ego" is clearly applicable here. (Cf. Geary v. Cain, 79 Utah 268, 9 P.2d 396, 398.)

The legal fiction of Star Oil Company should be ignored, "to prevent fraud and accomplish justice" under the facts established in the case at bar.

"Railway Express Agency" or by "United States Mail."

The Government's evidence established each of the checks was deposited with National, in respect to deposit slips, which established that National acted only as Star's collection agent in securing the proceeds of the checks. All such checks were received by National for deposit "with the distinct understanding that credit" thereof to Star's checking account was "subject to final payment and to receipt of proceeds of final payment in cash or solvent credit" to National, "at its own office." Notwithstanding such contractual conditions, it is appellant's contention that the checks "were not deposited for collection" but that National became a "holder in due course" thereof. Hence he says he may not be held responsible for National's transportation of the checks for "clearance" which admittedly he knew would be by use of the "mails" or other means of interstate commerce. More specifically, it is appellant's contention that because it was National's practice, unless overdrafts appeared, to immediately credit Star's checking account with the amount of the duped depositor's checks, as and when they were deposited, and appellant was allowed to make withdrawals from such account, against the amount so credited, before the duped investor's check was "cleared" through the Federal Reserve Bank of St. Louis, he cannot be found guilty of violating Section 17(a), supra. So contending, appellant argues that under the law relating to "bills and notes" and "banking"—National thereby became a "holder in due course" as to each such check when it was deposited with National. Under such circumstances, appellant asserts, "the mailing or transportation" of the checks here considered could not have been caused by him, "directly or indirectly"; and that under the above circumstances National, as a matter of law, cannot be considered as being an agent for or on his behalf, as the Government here contends.

It is on the above singular hypothesis that appellant asserts he cannot be found guilty of violating Section 17(a), supra, and seeks to have his convictions set aside. As support therefor, appellant relies on the following authorities: Kann v. United States, 323 U.S., 88, 89, 65 S. Ct. 148, 89 L.Ed. 88 (1944); Parr v. United States, 363 U.S. 370 (1960); Douglas v. Federal Reserve Bank of Dallas, 271 U.S. 489, 46 S.Ct. 554, 70 L.Ed. 1051 (1926); United States v. Schaefer, 299 F.2d 625 (7 Cir. 1962), cert. den. 370 U.S. 917, 82 S.Ct. 1553, 8 L.Ed.2d 497; Getchell v. United States, 282 F.2d 681 (5 Cir. 1960); Lowrance Motor Co. v. First National Bank, 238 F.2d 625, 59 A.L.R.2d 1164 (5 Cir. 1956); United States v. Taylor, 217 F.2d 397, 398 (2 Cir. 1954); Harper v. United States, 143 F.2d 795 (8 Cir. 1944); Darwin v. Jess Hickey Oil Corp., 153 F.Supp. 667 (D.C. N.D.Texas, 1957).

We shall not follow appellant in all the argument he undertakes to make and which he attempts to fortify by the above-cited authorities. That the contention made by appellant is not apposite to the crimes for which he was charged and found guilty; and, that the above-cited authorities pertaining to mail "fraud prosecutions," and other violations of the Securities Act of 1933, are patently distinguishable on their facts and law applicable, is made manifest when the following propositions are contemplated and properly postulated.

The Kann and Parr cases, supra, cover prosecutions under the Mail Fraud Statute, 18 U.S.C.A. § 1341; or conspiracy to do so, in violation of 18 U.S.C.A. § 371. We do not consider the facts in those prosecutions under the Mail Fraud Statute, to be wholly apposite to appellant's prosecutions for violation of Section 17(a) of the Securities Act of 1933, supra. There can be no question about the proof essential to sustain convictions under the Mail Fraud Act, as considered in Kann, Parr, and other cases cited by appellant, supra. But we are not here concerned with a prosecution for "mail fraud."

■ As we said in Harper v. United States, 143 F.2d 795, 801 (8 Cir. 1944):

"The devising of a scheme or artifice to defraud or to *obtain* money by means of fraud or false pretenses is not a crime either under the Securities Act or the Mail Fraud Act. It becomes a crime only in the event that in furtherance of the scheme or artifice to sell securities *any* means or instruments of transportation or communication in interstate commerce or the mails be employed." (Emp. added.)

■ More recently, we said in Creswell-Keith, Inc. v. Willingham, 264 F.2d 76, 80 (8 Cir. 1959):

"The courts have uniformly held that (the Securities Act of 1933) applies when the mails are used in furtherance of a fraudulent scheme, irrespective of whether the misrepresentations were transmitted by mail or in interstate commerce.

" * * * It is our best judgment that Congress inserted the mails and interstate commerce provision in (the Securities Act of 1933) for the purpose of establishing federal jurisdiction, and that Congress intended to assert its full constitutional power in granting civil relief from fraudulent transactions" (par. added)

when related to the *sale* of worthless securities, as defined in that Act. We think that is true also as to the criminal sanctions provided in Section 17(a), supra.

■■ The "evil at which the Securities Act is directed is the fraud in the *sale* of securities." United States v. Cashin, 281 F.2d 669, 674 (2 Cir. 1960). That being the congressional purpose and intendment to be covered by the "Securities Act of 1933," *a fortiori*, the law of "sales" and impact of fraud in relation to "sales", rather than the principles of "banks and banking" or "bills and notes," should be considered in making practical application of that Act to a given set of facts. In other words, it is our opinion that a scheme to defraud, in relation to a sale of securities, and the use of the mails in consummation thereof, is the gist of the crime denounced by the Congress in Section 17(a) of the Securities Act of 1933, supra. Under that Act, the use of the mails need not be central to the scheme to defraud (Cf. United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946); United States v. Cashin, supra; United States v. Monjar, 47 F.Supp. 421 (D.C.Del.1942), aff'd 147 F.2d 916 (3 Cir. 1944), cert. den. 325 U.S. 859, 65 S.Ct. 1192, 89 L.Ed. 1979 (1945). It is sufficient if the use of the mails is merely incidental to the fraudulent conduct which the Congress intended to reach and punish by the provisions of the Securities Act of 1933. Pereira v. United States, supra; United States v. Robertson, 181 F.Supp. 158 (S.D.N.Y. 1959), aff'd in part and reversed in part, United States v. Robertson, 298 F.2d 739 (2 Cir. 1962).

■ So considered, the crucial question presented by this appeal is whether the clearance of the duped investors' checks through National and the Federal Reserve Bank in St. Louis, was either a "direct or indirect use of the mails" by appellant in execution of his scheme to defraud, as established by the evidence here. Appellant's argument that he is to be freed of such fraud because National, upon receipt of the checks in question, immediately credited Star's account and permitted him to withdraw funds so credited, before such checks were cleared through the Federal Reserve Bank of St. Louis, is without any merit. The established fact is that appellant utilized National, and, through it, "means" of "interstate transportation—or—the use of mails, directly or indirectly," to have checks which he obtained as one step in his scheme to defraud investors of their money. That he knew and intended to have the above checks "cleared" and charged against the bank account of

those investors cannot be in doubt. Therefore, appellant's device, scheme, and artifice to defraud such duped investors was not dispelled by his deposit of their checks in National and securing credit therefor. Hart, et al. v. United States, 112 F.2d 128 (5 Cir. 1940), cert. dis. 311 U.S. 722, 61 S.Ct. 6, 85 L.Ed. 471; cert. den. 311 U.S. 684, 61 S.Ct. 60, 85 L.Ed. 441; rehear. den. 311 U.S. 726, 61 S.Ct. 131, 85 L.Ed. 473. Regardless of the language on the deposit slips and the relationship thereby created between National, Star, and appellant, the fact is that appellant's criminal conduct and intention was centrally established to be for a singular purpose, i. e. to defraud the duped purchaser, not of a "check" but of "money" as disclosed by the course of conduct appellant pursued. The gist of his fraud was to sell worthless, undivided interests in oil and gas leases and receive money from the persons whom he intended to defraud, by way of checks which he knew and intended should and would be cleared in the usual course of business and charged against their individual bank accounts in payment for the worthless securities he sold them. Under such a scheme the "impact" of his fraud on such investors did not with finality occur until the checks he obtained from them, as a step in his unlawful scheme and artifice, reached the investor's bank and the sum of the check was charged against the duped investor's bank account. Then, and only then, did the impact of appellant's fraud fall upon those whom he intended to, and did, defraud.

In Pereira v. United States, supra, 347 U.S. l. c. 8–9, 74 S.Ct. loc. cit. 363 it is said:

"Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."

Pereira, and Hart v. United States, supra, are particularly applicable to the facts here, for:

"Unless the parties otherwise agree, either expressly or by implication, the giving of a check for goods purchased usually is only a conditional payment, whether the check is drawn on the buyer's account or on the account of another, provided it is not accepted as an absolute payment. * * * Ordinarily, in a sale for cash, a check is not payment until it is actually paid." Sales: § 238b, 77 C.J.S., pp. 1014–1015.

"Under the Uniform Negotiable Instruments Act, the provision, which has been applied in a number of cases, (civil and criminal) is that a check, of itself, does not operate as an assignment of any part of the funds to the credit of the drawer with (his) bank." (Par. added.) 10 Am.Jur.2d, § 562, p. 531. See also, § 3–409, Uniform Commercial Code, sub. (1).

Section 17(a) of the Securities Act of 1933, supra, is clear—if the mail is "used in employing the scheme however incidental the mailing may be"; a prosecution thereunder may be sustained (United States v. Schaefer, 299 F.2d, l. c. 630); and it is particularly recognized that prosecutions under that Act are "broader" than those under the Mail Fraud Statute, "depending on whether fraud or the use of the mails is considered to be the gist of the offense" as proscribed by Section 17(a), supra. (Cf. Getchell v. United States, 5 Cir., 282 F.2d 681, 684.)

That the scheme to defraud is the evil intended to be controlled and remedied by passage of the Securities Act, supra, cannot be in doubt, in the light of what is said in Wilko v. Swan, 346 U.S. 427, 430–431, 74 S.Ct. 182, 184, 98 L.Ed. 168 (1953). There, Mr. Justice Reed stated:

"In response to a Presidential message urging that there be added to the ancient rule of *caveat emptor* the further doctrine of 'let the seller also beware,' Congress passed the Secu-

rities Act of 1933. Designed to protect investors, the Act requires issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale."

Our conclusion reached in Creswell-Keith, Inc. v. Willingham, supra, is wholly compatible with the congressional intendment of the Securities Act of 1933, supra. It has been followed in United States v. Cashin, supra; United States v. Robertson, supra; United States v. Hughes, 195 F.Supp. 795 (D.C.S.D.N.Y. 1961). Cf. also, Roe v. United States, 316 F.2d 617 (5 Cir. 1963). Since the dominant purpose of the Securities Act was to prevent the victimizing of investors, a defrauder may not evade prosecution thereunder if he takes a check and negotiates the same to secure the money he wanted, where any medium of interstate commerce, "directly or indirectly" is used for that fraudulent purpose. It is here clearly established that appellant knew the "mails would be used directly or indirectly" in carrying the impact of his fraud to those he intended to victimize. Looking at those transactions in their entirety and reality, it is our opinion that when appellant deposited the defrauded investors' checks at National he could only have contemplated that in due course, and as a direct result of such action, the mails or other means of interstate commerce would be used to complete the fraud he intended to perpetrate in the sale of the securities as here to be considered. Cf. United States v. Doran, 7 Cir., 299 F.2d 511, l. c. 515 (1962).

There is no merit to appellant's contention that the indictment returned against him, and each count thereof, was insufficient to state a crime under Section 17(a) of the Securities Act of 1933; nor that the evidence was insufficient to establish federal jurisdiction over such crime, or to support his verdict of guilty.

Appellant, by after-trial motion timely filed, seeks another trial on such indictment because of alleged juror misconduct. The first assignment so made relates to a conversation Donald Dunn, one of the jury at defendant's trial, had with Fred W. Rowe, III, a Government witness. It occurred in the Coffee Shop in the Federal Courthouse in St. Louis, Missouri, during appellant's trial. Upon being informed thereof, prior to return of the jury's verdict in this case,—District Judge Harper, in open court in the presence of defendant and the assembled jury, stated:

"A matter has arisen which I think that I should inquire of you individually about. It has been suggested that someone on the jury may have discussed or talked to one of the witnesses in this case, and would you just give me a yes or no answer as I call the list?"

Upon poll of the jury, Juror Dunn answered, "Yes". Upon specific inquiry by Judge Harper, made before the jury's verdict was received, addressed to Juror Dunn: "Did you discuss in any way the matter of the case?" a negative answer was received from Juror Dunn. Counsel for appellant was thereupon permitted to propound more specific questions to Juror Dunn. Upon being satisfied after such inquiry that there was no "conversation of any nature concerning this case" between Juror Dunn and the witness, Rowe, the jury's verdict was received by the Court. Thereafter, and after motion for new trial was timely filed, a more specific and exhaustive hearing was held by Judge Harper on the two assignments appellant makes as to juror misconduct. At that hearing, counsel for both parties, by way of cross-examination, extensively probed such assignments of error, particularly as to Juror Dunn's conversation with Rowe; as well as appellant's assignment of error made in relation to the alleged failure of Juror Eilermann, foreman of appellant's jury, to disclose on voir dire examination acquaintance or business dealings he may have had with Mr. Morris A. Shenker, senior member of the law firm of which appellant's trial counsel was a member.

It appears in this record that the law firm of counsel for appellant had some previous litigation in which Eilermann Transfer Company and Ace Cab Company were involved. Mr. Eilermann on voir dire examination, disclosed that he was Vice President and Secretary of the Eilermann Transfer Company. Notwithstanding, it is appellant's counsel's contention that Mr. Eilermann failed to disclose the pendency of the litigation in which Ace Cab Company and Eilermann Transfer Company were parties. The record does not reveal whether they were opposing or joint parties to that action. However, it does appear that Eilermann Transfer Company was represented by counsel for a liability insurer in respect to that action. The firm of Morris A. Shenker and Associates represented Ace Cab Company. It was Juror Eilermann's testimony at the post-trial hearing that he did not know that Mr. Shenker or his associates were counsel for Ace Cab Company, and there is not a particle of evidence in the record before us even suggesting a chimera suspicion *contra*.

As to the conversation Juror Dunn had with Rowe, a reasonable inference to be made from the record here is that the only matters discussed between those parties concerned the weather in St. Louis, perhaps, the making of whiskey, and horse racing in Kentucky where Rowe resided. But, in the course of the conversation, it is established that some reference was made either by Mr. Rowe or Juror Dunn, relative to "this mess upstairs."

We have meticulously examined in the record before us all that relates to the above assignments of error. We, like District Judge Harper, can find no merit to appellant's claim of reversible error as a consequence of either situation.

We are cognizant that:

"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial * * *. The presump-

tion is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954).

We are also mindful that what influences a particular juror in every situation necessarily is vague and indefinite.

 However, it is well settled that what is prejudicial to a fair trial when the issue of "juror misconduct" is raised, is a matter that must, to a large extent, be left to the discretion of a trial court and that an appellate court will not reverse the determination of that court on such an issue unless it is established as clearly erroneous. Mattox v. United States, 146 U.S. 140, 147, 13 S.Ct. 50, 36 L.Ed. 917; Wheaton v. United States, 133 F.2d 522 (8 Cir. 1943); United States v. Flynn, 216 F.2d 354 (2 Cir. 1954); Holmes v. United States, 284 F.2d 716 (4 Cir. 1960).

In the Wheaton case, supra, Judge Sanborn, speaking for this Court, said:

"* * * Communications, relative to a case on trial, between jurors and third persons, or witnesses, or the officer in charge of the jury, are absolutely forbidden, and, if it appears that such communications have taken place, * * * there is a rebuttable legal presumption that (such communications) were prejudicial * * *."

Under the facts here, we think that any presumption of prejudice that might exist because of Juror Dunn's conversation with Rowe has been clearly rebutted.

As to the assignment of error regarding Juror Eilermann, we are not persuaded that Judge Harper's ruling thereon was "clearly erroneous." Cf. Stanczak v. Pennsylvania R. Co., 174 F.2d 43, 48 (7 Cir. 1949); Christian v. Hertz Corp., 313 F.2d 174 (7 Cir. 1963); Brown v. New York Indemnity Co., 39 F.2d 443 (8 Cir. 1930).

Affirmed.